J.J. v. M.C.

*Michael Hanamirian*, for appellee.

*Patrick Daley* and *Kristen Daniels Rushing*, for appellant mother.

*Craig Huffman*, for appellant-intervener husband.

DOZOR, *J.*, February 25, 2014—

## AMENDED OPINION[1]

This appeal is considered as a direct appeal from this court's January 27, 2014 "order granting petitioner's request for paternity and genetic testing and denying preliminary objections." The nature and history of the case is as follows:

---

1. This court notes that this opinion amends the opinion dated February 24, 2014 solely to ensure the anonymity of the parties and to delete a paragraph which was inadvertently added twice to the original opinion.

274

On December 6, 2012, Appellee, J.J., filed a complaint to establish paternity and genetic testing of minor child born on September 8, 2012. The complaint to establish paternity and genetic testing was scheduled before a master for a January 2, 2013 Hearing. On December 19, 2012, appellant Mother M.C. filed an answer to the complaint to establish paternity and genetic testing. The January 2, 2013 hearing before the master was continued to January 22, 2013. On January 22, 2013, appellant mother's counsel requested that this case be relisted before a judge pursuant to Pa.R.C.P. 1915.4-1(b)(1), due to the complex issues of paternity in this case.

On February 26, 2013, the undersigned court scheduled this case for a pre-trial conference on May 2, 2013. In preparation for the pre-trial conference this court requested that the parties submit concise conference statements. On April 24, 2013 appellant mother filed a petition to strike paragraph 21 and Exhibit "E" of plaintiff's concise conference statement.[2] On April 25, 2013, petitioner filed a response to defendant mother's petition to strike paragraph 21 and Exhibit "E" of plaintiff's concise conference statement.

This court held a pre-trial conference on this case on May 22, 2013. Thereafter, this court scheduled this case for a trial date on October 7, 2013.

On October 3, 2013, appellant mother's husband (D.T.) filed a petition to intervene and to change the case caption. On October 3, 2013, appellant mother and appellant intervener husband, D.T. (appellant mother's husband), filed preliminary objections seeking dismissal of petitioner's complaint on the basis that the child was

_____
2. Both appellants requested that the court strike any reference *to the results* of a previously obtained paternity test.

born into an intact marriage and thus the presumption of paternity bars petitioner's complaint.

On October 7, 2013, this court issued an order granting appellant mother's motion to strike paragraph 21 and Exhibit "E" of plaintiff's concise conference statement. This court granted the petition to strike paragraph 21 and Exhibit E, in an abundance of caution and to preserve the record. The effect of this court's ruling removed from the records any reference of the *results* of the paternity test that was taken in June of 2012 between appellant mother, appellee and the then unborn minor child.

Additionally, on October 7, 2013, this court issued an order granting appellant intervener husband (D.T.'s) petition to intervene and change the case caption.

This court held a hearing in this matter on October 7th and 8th, 2013 and after the trial, this court took the matter under advisement. All of appellants' arguments were based on their claim that proper application of the presumption of paternity bars appellee from asserting any parental claim to the minor child.

After receiving memoranda of law from all parties involved, this court issued an order on January 27, 2014, denying appellants' preliminary objections and granting appellee's request for genetic testing. The effect of the January 27, 2014 order was that the preliminary objection which sought dismissal of appellee's complaint to establish paternity and genetic testing on the basis that the child was born into an intact marriage and thus the presumption of paternity barred appellee's complaint was denied and appellant mother, appellee and minor child were ordered to report to the Domestic Relations Office (DRO) within ten (10) days of the date this order to undergo genetic testing.

On January 29, 2014, appellant mother filed an "emergency motion to stay enforcement of January 27, 2014 order granting petitioner's request for paternity and genetic testing and denying preliminary objections." Appellant mother also filed a timely "notice of appeal" and her "concise statement of matters complained of on appeal."

On January 30, 2014, this court issued an order granting appellant mother's emergency motion to stay enforcement of January 27, 2014 order which granted petitioner's request for paternity and genetic testing and denying preliminary objections until a decision is made by the Superior Court on appellants' appeal of said order.

On January 31, 2014, appellant intervener husband filed a timely "notice of appeal" and his "concise statement of matters complained of on appeal."

This court notes that no request was made by this court of either appellant pursuant to Pennsylvania Rules of Appellate Procedure 1925(a) for a concise statement of matters complained of on appeal as both parties filed their concise statements contemporaneously with their notice of appeals. On February 11, 2014, this court received a letter from the Superior Court informing this court that the appeals in this case have been designated as a "children's fast track appeal."

Both appellants' concise statements of matters raised on appeal raise similar, if not identical, issues of error on the part of this court in issuing the January 27, 2014 order. The issues, which have been consolidated, are as follows:

1. This court erred and committed an abuse of discretion when determining that appellee failed to overcome the application of the presumption of paternity by not

establishing that appellant intervener husband was "incapable of fathering a child or did not have access to wife" and determining that appellant mother and appellant intervener husband did not have an intact marriage.

2. This court erred and committed an abuse of discretion when this court admitted evidence of appellee's related to the period of time prior to the date of minor child's birth.

3. This court erred and committed an abuse of discretion when determining that appellant intervener husband could not have known of appellant mother's conduct.

4. This court erred as a matter of law in confusing the presumption of paternity with paternity by estoppel doctrine.

## FACTS:

There was no dispute during the trial that appellant mother and appellant intervener husband were married on June 21, 2007 and there was no dispute that on the date of the minor child's birth, September 8, 2012, appellant mother and appellant intervener husband remained *legally* married. This court also notes that appellant intervener husband's name is listed as the father of minor child on the birth certificate. N.T., 10/07/2013, Vol. 1, pgs. 202 and Exhibit D-1. Additionally, it is not in dispute that prior to becoming pregnant with minor child, appellant mother engaged in an extended extra-marital affair with appellee.

Appellant mother is employed as a registered nurse at Jefferson University Hospital, Methodist Division who began communicating with appellee when appellee contacted her via Facebook. The online communication between appellee and appellant mother began in June of

2011 and quickly became a physical affair. The testimony of both appellee and appellant mother was uncontroverted regarding the beginning of their affair and the extremely short time period between the initial Facebook communication and their in person meeting. Appellant mother met appellee and his friend at a bar in Philadelphia sometime during the end of June or the beginning of July 2011.

At the time that they met appellee was informed by appellant mother that *she was legally separated from her husband*,[3] appellant intervener husband, and that they were only residing together for financial reasons. Appellant mother candidly and credibly testified that at this point in her relationship with appellant intervener husband there was a "rough patch" in her marriage.

After their initial meeting at the bar in Philadelphia, appellee and appellant mother continued to communicate electronically and continued to see each other in person. Appellee and appellant mother met again in person at a Holiday Inn Hotel in Philadelphia on July 4, 2011. Appellant mother asked appellee to get a hotel room where they both spent the night and engaged in sexual relations. Thereafter, appellant mother went to work on July 5, 2011 and she purchased a hotel room for her and appellee that night, July 5, 2011, at the same Holiday Inn Hotel where they again engaged in sexual relations.

Following their two day/nights at the Holiday Inn in Philadelphia over the July 4th holiday, appellant mother went to Wildwood, New Jersey to meet up with appellee. During the time that appellant mother and appellee were

---

3. This court notes that there was no evidence presented in court to demonstrate that there was a "legal separation" between the appellant mother and appellant intervener husband.

in Wildwood, New Jersey, appellee's family was also staying in Wildwood, New Jersey. Appellee and appellant mother stayed in a hotel room together in Wildwood, New Jersey for two nights, where they again engaged in sexual relations, met appellee's family and friends, and attended a dance competition.[4] During this vacation in Wildwood, New Jersey with appellee, *appellant mother represented herself as single while she socialized with appellee and his friends and family.* While appellant mother was in Wildwood, New Jersey with appellee, appellant mother told appellant intervener husband that she was staying with friends. At that time, appellant intervener husband did not question the veracity of appellant's mothers whereabouts.

Following the vacation in Wildwood, New Jersey and throughout the entire summer of 2011, appellant mother began visiting appellee at his mother's house. When appellant mother would visit appellee, she would stay overnight at appellee's mother's house. N.T., 10/08/2013, Vol. 2, p. 219. During the summer months of 2011, *appellant mother continued to hold herself out as single and represented herself to the public, appellee and his family and friends that she was a single woman who was dating appellee.*

Appellant mother would visit appellee multiple times during the week between July of 2011 and September of 2011 and while doing so consistently deceived and lied to appellant intervener husband about her whereabouts.

This court determined, based upon the credible testimony presented at trial, that appellant mother ate meals with appellee, would spend the day/night with appellee and would get ready for work at appellee's mother's

---

4. Petitioner's mother owns and operated several dance studios in Pennsylvania.

house before appellant mother would then commute directly to work in Philadelphia. This court notes that appellant mother testified that on occasions she would in fact commute directly to work in Philadelphia; however, appellant mother also testified that sometimes she would not commute directly to work but would rather stop at her residence in Boothwyn and see appellant intervener husband.

During the months of July of 2011 and May of 2012, appellant mother held herself out to appellee's friends and family as appellee's girlfriend. Between July of 2011 and late winter/early spring of 2012, appellant mother continually told appellee and appellee's friends and family that she was separated from appellant intervener husband. During this same time period, appellant mother introduced appellee to her family, friends and coworkers and attended parties together thrown by both appellee and appellee's mother and appellant mother's friends and coworkers. During the entire time appellee and appellant mother were together, appellant mother allowed appellee's niece and nephew to call her aunt.

Just prior to leaving for a vacation on Labor Day weekend of 2011, appellant mother informed appellee that she was pregnant. This court notes that appellant mother never informed appellant intervener husband about this pregnancy. This conversation occurred during an overnight stay at a hotel in Bethlehem, in a room that appellant mother purchased. Appellant mother made no mention to appellee about there being a possibility that the child was not his. From September of 2011 through May of 2012, appellee's friends and family were told by appellee that appellant mother was expecting appellee's child. Appellant mother testified that she did not personally tell appellee's friends and family that she was expecting

appellee's child; however, she also did not stop appellee from telling his friends and family he was the father of appellant mother's unborn child nor did she correct them when they discussed appellee as the father of the unborn child.

Following the announcement of her pregnancy, appellant mother looked for and leased an apartment with appellee in September 2011. Appellant mother testified that in October of 2011 she unfortunately had a miscarriage; however, appellant mother testified that she did not inform appellee about this miscarriage. Appellant intervener husband also testified that he was not informed that appellant mother had a miscarriage until well after the litigation began in this case.

Following the miscarriage, appellant mother continued to demonstrate to the public that she was in a committed relationship with appellee. Appellant mother attended a birthday party for appellee's nephew at the end of October of 2011. Appellee and appellant mother attended a Halloween party in coordinating costumes. This court notes that this Halloween party was a "couple's party" thrown by *appellant mother's coworker*.

After Halloween, appellant mother and appellee moved into the jointly leased apartment located at 220 East Broad Street in Quakertown, Pennsylvania and both appellant mother and appellee signed the one-year lease as tenants. Appellant mother personally advanced and paid rent for the jointly leased apartment. The apartment was furnished and in this apartment appellant mother kept clothes for work and personal use as well as personal hygiene products. Appellant mother spent three to four days or nights per week, with and without appellee, at the apartment appellant mother shared with appellee.

Appellant mother celebrated Thanksgiving of 2011 with appellee and his family.

This court heard candid testimony from the parties that appellant mother and appellee were sexually active between October of 2011 and December of 2011 and this court heard candid testimony that appellant mother and appellant intervener husband were sexually active between October of 2011 and December of 2011. Minor child in question was conceived in the early days of December of 2011.

In preparation for the Christmas holiday, appellant mother went with appellee to purchase a Christmas tree for the Quakertown apartment and they put the tree up together and both participated in decorating the tree. Appellant mother spent Christmas Eve of 2011 with appellee in their jointly leased apartment. Appellant mother and appellee visited appellee's family on Christmas day. Appellant mother was included in photographs taken of appellee's family in front of the Christmas tree during the holiday.

A mug with a sonogram photograph and the name Chloe Marie, the baby name discussed by appellant mother and appellee, was given to appellee's sister and mother on Christmas of 2011 as a gift. Appellee credibly testified that appellant mother provided appellee with the picture of the sonogram used for the mug. Both appellant mother and appellee agreed that appellee did not attend an ultrasound that resulted in that sonogram picture. Appellee alleged that appellant mother sent him the ultrasound via email; however, appellant mother disputes that contention. Appellant mother did provide testimony that appellee took the picture of the ultrasound from her. Appellee credibly testified, and this court is not making and does not need to make a determination as to whether

or not this photo mug's ultrasound was either the baby that appellant mother miscarried or the baby that was carried to term.

During the early months of 2012, appellant mother's sister, who had been terminally ill, passed away. Appellee, appellee's mother, and sister planned to attend the funeral of appellant's mother's sister up until minutes before they were scheduled to leave at the last minute appellant mother informed appellee and appellee's family that she was not attending the funeral due to a conflict between appellant mother and her mother.

Appellant mother attended a wedding, of appellee's friends, with appellee in March 2012. Also, in March of 2012, appellant mother informed appellee that her divorce with appellant intervener husband was finalized and that she was awarded the house in the distribution of their property. Appellant mother and appellee made arrangements to end their one year lease early and to move into appellant mother's Boothwyn residence.

In anticipation of the baby due to appellant mother and appellee, appellee's family planned and held a baby shower for the couple. In anticipation of the baby's arrival and the shower, appellant mother and appellee travelled together to Babies R Us and created a baby registry. The baby shower given by appellee's family was held in March of 2012. Appellant mother attended the baby shower, accepted the gifts and best wishes from appellee's family and friends. Appellant intervener husband testified that he did not notice if the baby items had come into his Boothwyn residence as his family and friends as well as appellant mother's co-workers had also given her a baby shower.

In April of 2012, appellant mother, appellee, appellee's

family and the family's dance studio students, took a bus trip to New York City to see a play. Also in April of 2012, appellee visited appellant mother and appellant intervener husband's home in Boothwyn with appellant mother. Appellee alleged that he and appellant mother spent the night at the Boothwyn home and had sexual relations in that home. Appellee also alleged that on a second occasion they attempted to visit the residence; however, upon seeing a vehicle in the driveway, which appellant mother alleged was a cousin's vehicle, they did not go into the Boothwyn house but rather went to Philadelphia and rented a hotel room for the night.

The testimony was clear that it was the intention of appellant mother and appellee to move into the Boothwyn residence following the Mother's Day holiday of 2012. In anticipation of this move, appellant mother and appellee packed up the belongings in the Quakertown apartment and agreed with the landlord to an early termination of their lease. Appellee and appellant mother's move was to occur the Monday following Mother's Day of 2012 and as such all of appellant mother and appellee's belongings that were in the Quakertown apartment were packed in their respective vehicles.

In May of 2012, appellant mother celebrated Mother's Day 2012 with appellee's mother and appellee's family. The testimony was clear that appellant intervener husband did not spend this holiday with appellant mother nor did appellant mother spend this holiday with anyone in her family. Appellant mother attended a party at appellee's parents' home on Mother's Day. Following the party, appellee mother and appellee took appellee's mother out to dinner. Appellee testified that after returning to his mother's house on Mother's Day, appellant mother left that residence at approximately 4:30 AM to go to

the Boothwyn house early. Appellant mother confirmed that after spending the day with appellee's family, taking appellee's mother out for dinner on Mother's Day, going to the casino and going to sleep in appellee's bed in appellee's mother's house, appellant mother left appellee's mother's home and went alone, to the house in Boothwyn.

When appellee telephoned appellant mother to inquire about the logistics of the move into the Boothwyn house that day, appellant mother informed appellee that things between them had progressed too quickly and she needed time. Only after appellant mother claimed to need more time and because it was appellant mother, who had pushed for the move to the Boothwyn house and was now delaying their joint move to appellant mother's Boothwyn house, did appellee question her motives and required answers as to why she now chose not to live with appellee.

After Mother's Day in May of 2012, appellee called appellant intervener husband at the place of his work and asked about the status of his relationship with appellant mother. Appellant intervener husband informed appellee that he was still married to appellant mother and that they were expecting a child in September of 2012. Appellant intervener husband testified that he was unaware of appellant mother's extra martial affair until May of 2012, when he received appellee's telephone called which revealed the affair.

At all times that appellant and appellee were a couple, appellant mother had advised and represented to the public, appellee, and his family, by actions and words, that she was either single or separated from appellant intervener husband and in the process of a divorce from appellant intervener husband.

In June of 2012, appellee's mother and a friend arrived

at the Boothwyn house and there was a brief interaction with appellee's mother and appellant intervener husband before appellant mother arrived at the house. Appellee's mother confronted appellant intervener husband about appellant mother's relationship with appellee and the unborn minor child while standing in the driveway of appellant mother and appellant intervener husband's Boothwyn house. Following this interaction, appellant mother again met with appellee in a hotel in Quakertown. Appellee testified that appellant mother initially informed him she would be bringing a copy of her divorce papers; however, when he arrived appellant mother did not have the divorce papers. It was at this meeting that appellee first learned about appellant mother's miscarriage and subsequent pregnancy.

After learning that appellant mother and appellant intervener husband were still legally married, *appellee was still assured by appellant mother that the child she was carrying was still appellee's child.* Appellee always, after being advised by appellant mother of her pregnancy, held himself out as the birth father and pursued his parenthood. Additionally, appellant mother represented, by her conduct, her actions, and words to appellee and his family and the public that appellee was the father of her unborn baby.

During the pregnancy, appellee attended at least two obstetrics and gynecology appointments with appellant mother. At the first OB/GYN appointment, appellant filled out and provided Medical History Forms.

On May 30, 2012, after appellee confronted appellant intervener husband about the relationship with appellant mother and the pregnancy, appellant mother, appellee and the yet unborn baby underwent a paternity test. Appellant

mother requested the DNA test be conducted, not appellee. Appellant mother found the location, drove appellee and herself to the location and paid for this DNA testing. This court notes that the DNA test was performed and, the results are known to the parties; however, the results were precluded from admission during this court trial.

During the summer of 2012, appellee, appellant mother, and appellee's sister met at a Starbucks. During this meeting, which was held sometime in the end of July or beginning of August 2012, appellant mother informed appellee that she wanted him to be present during the childbirth of the baby and provided appellee with the name of the hospital where she was scheduled to give birth. In September of 2012, through Facebook messages from appellant mother's Facebook account, appellee was informed of appellant mother's labor status up until the time of minor child's birth.

Sometime after being confronted by appellee and appellee's mother, appellant intervener husband changed appellant mother's cellular telephone number because that was the only thing he "had control over." However, the testimony was clear that throughout the summer of 2012 and up until the time of the birth of minor child, appellant mother and appellee were still communicating. Appellant intervener husband conceded in his testimony that he was and remains unaware if appellant mother and appellee were still communicating via Facebook as he is not a member of that internet site.

The testimony of appellant intervener husband and appellant mother was that appellant mother told appellant intervener husband that she was out with friends/co-workers, with her terminally ill sister or working in order to cover up the extra-marital relationship. Appellant

intervener husband testified that he did not question appellant mother as to her whereabouts because she "had some valid alibi as far as being at work, or being with work friends, or having an obligation, or got to her parents." Appellant intervener husband testified that although appellant mother led a very busy life, having a demanding job, having numerous work and other friends she interacted with, spending time with her terminally ill sister and her family, as well as having an extra-marital affair, he "usually still saw her on holidays." Appellant intervener husband testified that appellant mother's job as an ICU nurse meant that she would work nights, weekends and holidays.

This court finds it incredulous that appellant intervener husband was unaware of appellant mother's duplicity, lies and life with appellee.

Appellant intervener husband testified that he was not made aware of the pregnancy of appellant mother that occurred in September of 2011 and which ended in a miscarriage in October of 2011, *until sometime in January of 2013*. Appellant intervener husband candidly testified that he learned only *a few weeks before this court's October 7 and 8, 2013 trial* that appellee and appellant mother had leased an apartment together in November of 2011 or that appellee's family had thrown appellant mother a baby shower in March of 2012.

Based upon the information, evidence and testimony provided to this court on October 7 and 8, 2013, this court found that appellant intervener husband's claim and examples of having an intact marriage were implausible, improbable and not credible.

This court notes that minor child was born on September 8, 2012. After September 8, 2012, but before appellant

mother and minor child were released from the hospital, appellee's family arrived at the hospital to see appellant mother and minor child. Upon seeing appellee's family, appellant mother denied appellee's family access to her, her room or to minor child. Since the birth of minor child, petitioner and petitioner's family have not seen minor child.

Within a week of the birth of minor child, appellee's parents arrived at the residence of appellant mother's mother; it was at this encounter where appellant mother's mother learned of her affair and the possibility that appellant intervener husband might not be the biological father of minor child.

On or about September 18, 2012, or within ten (10) days of minor child's birth, a certified letter was sent to appellant mother from appellee's prior counsel. This certified letter from appellee's former counsel states that appellee has contacted legal counsel and is seeking a custodial arrangement with minor child between appellant mother and appellee. Thereafter, on December 6, 2012, appellee, filed the underlying a complaint to establish paternity and genetic testing of minor child born on September 8, 2012. It was clear from the testimony in this case, that in appellee's words and actions, he openly pursued his parental role before, during, and after minor child was born.

## DISCUSSION:

The issues of both appellant mother and appellant intervener husband are not only similar and nearly identical, but all the issues are interrelated. As such this court will address all the issues interchangeably. Appellants' allege that this court erred and committed an abuse of discretion: when determining that appellee

failed to overcome the application of the presumption of paternity by not establishing that appellant intervener husband was "incapable of fathering a child or did not have access to wife" and determining that appellant mother and appellant intervener husband did not have an intact marriage; by admitting into evidence testimony and evidence of appellee's related to the period of time prior to the date of minor child's birth; by determining that appellant intervener husband could not have known of wife's conduct; and, confusing the presumption of paternity with paternity by estoppel doctrine.

This court's January 27, 2014 order was not intended to deflect or deny the long history of case law confirming the long standing presumption of paternity; to the contrary, this court was guided by the case law instruction that the presumption only applies when the parties have an "intact marriage." There is overwhelming clear and convincing evidence that appellant mother and appellant intervener husband did not have an intact or functioning marriage. The court finds it curious that the application of the presumption of paternity displaces the customary rule of a custody court to weigh the best interests of the child and a pattern of partial custody and/or visitation that would serve the child's best interests and that the Commonwealth's interest to preserve and protect a marriage could trump a child's opportunity to know, live and appreciate his/her biological father.

In this case, appellant mother held appellee out to the public as the father of the minor child. Appellee had openly pursued his parental role before, during, and after minor child was born. This court finds that appellant mother and appellant intervener husband did not have an "intact" marriage. Case law has clarified this common law presumption by asserting the presumption of paternity

applies *only* where the underlying public policy to preserve marriages would be advanced by application of the presumption of paternity and thus when there is no intact family or a marriage to preserve and then the presumption of paternity is not applicable. *Vargo v. Schwartz*, 2007 Pa. Super. 402, 940 A.2d 459, 463(2007); *Brinkley v. King*, 549 Pa. 241, 250-51, 701 A.2d 176, 181 (1997) (plurality); *Barr v. Bartolo*, 927 A.2d 635, 643 (Pa. Super. 2007).

In the Commonwealth of Pennsylvania the presumption of paternity embodies the fiction that regardless of biology, the married people to whom the child was born are the parents of said child. *K.E.M. v. P.C.S.*, 614 Pa. 508, 38 A.3d 798, 800 (2012) quoting *Brinkley v. King*, 549 Pa. at 249, 701 A.2d at 180.

This court did not confuse and/or conflate the two separate and distinct legal doctrines. This court is well aware that in the Commonwealth of Pennsylvania, the presumption of paternity is considered to be "one of the strongest presumptions within our law." *See K.E.M. v. P.C.S.*, 38 A.3d at 800 citing Brinkley, 549 Pa. at 246, 701, A.2d at 179 (quoting *John M. v. Paula T.*, 524 Pa. 306, 322, 571 A.2d 1380, 1388 (1990) (Nix, C.J., concurring)), *Strauser v. Stahr*, 556 Pa. 83, 89, 726 A.2d 1052, 1055 (1999).

The Pennsylvania Supreme Court has summarized the legal analysis required for the court's determination of the paternity of a child conceived or born during a marriage:

[F]irst, one considers whether the presumption of paternity applies to [the] particular case. If it does, one then considers whether the presumption has been rebutted. Second, if the presumption has been rebutted or is inapplicable, one then questions whether estoppel applies.

*Vargo v. Schwartz*, 940 A.2d at 462 citing *Strauser v. Stahr*, 556 Pa. 83, 89, 726 A.2d 1052, 1055 (1999) (quoting *Brinkley v. King*, 549 Pa. 241, 250, 701 A.2d 176, 180 (1997) (plurality opinion)); *N.C. v. M.H.*, 923 A.2d 499, 502-03 (Pa. Super. 2007) (plurality opinion).

Additionally, this court was well aware that under the presumption of paternity, there must be "clear and convincing evidence that the presumptive father lacked access to the mother or was incapable of procreation." *See K.E.M. v. P.C.S.*, 38 A.3d at 800-01 citing *Brinkley*, 549 Pa. at 248, 701 A.2d at 179. The appellate courts have traditionally discussed the public policy rationale for supporting the presumption of paternity is "the concern that intact marriages should not be undermined by disputes over parentage." *K.E.M. v. P.C.S.*, 614 Pa. 508, 38 A.3d 798, 800-01 citing *Brinkley*, 549 Pa. at 249, 701 A.2d at 180.

Like in *Vargo v. Schwartz*, the underlying question in this case was: whether the family was intact and was there a marriage to preserve? Both of these are questions of fact, which fell squarely within the realm of this court as fact-finder to render a determination on. 940 A.2d at 467. This court, as the finder of fact, was entitled to weigh the evidence presented by appellee, appellant mother and appellant intervener husband was also to assess the credibility of each witness and weighing the evidence and assessing the credibility of the witnesses, this court was "free to believe all, part, or none of the evidence." *Vargo v. Schwartz*, 940 A.2d at 467 quoting *Smith v. Smith*, 904 A.2d 15, 20 (Pa. Super. 2006).

An intact family is a family that is a functional family who is living together and interacting in a household on a regular, daily basis. *C.W. v. L.V.*, 2001 PA Super 332,

788 A.2d 1002, 1005 (2001). The normal activities that a functioning family participates in include communicating with one another, making meals, going to bed, getting up in the morning, interacting with the community, and interacting with extended family. *Id.* In this case appellant mother and appellant intervener husband were not a fully functional family, they did not interact as a household on a daily or even a regular basis.

This court notes, as it did in the January 27, 2014 order, that in 2007, the Pennsylvania Superior Court issued a ruling in *E.W. v. T.S.*, 2007 PA Super 29, 916 A.2d 1197 (2007). In *E.W. v. T.S.*, T.S. and her husband argued the presumption of paternity applied and therefore E.W. should be precluded from having standing to seek custody of minor child. This case is substantially similar to *E.W. v. T.S.* with one major exception.

Analogous to the case *sub judice*: T.S. and her husband were married during the birth of the child; her husband was the named father on the birth certificate of the minor child; T.S. and her husband maintained and engaged in a sexual relationship within the period surrounding the date of conception while T.S. was also engaged in a sexual relationship with E.W. within the period surrounding the date of conception; and, T.S. and E.W. conducted their affair openly and only concealed it from husband. *See generally*, *E.W. v. T.S.*, 916 A.2d 1197.

This court notes that the appellate court in *E.W. v. T.S.*, the court found that, despite mother's infidelity, because T.S. did not move out of the marital home seeking to establish living quarters with E.W., there was still an intact marriage that existed between T.S. and husband. *E.W. v. T.S.*, 2007 PA Super 29, 916 A.2d 1197,1204 (2007). That is the fact where the case *E.W. v. T.S.*, is *clearly distinguishable* from

the case *sub judice*. Here, appellant mother and appellee jointly leased an apartment in Quakertown, Pennsylvania. Both appellant mother and appellee lived in this apartment for multiple nights per week for most of their relationship. During their relationship, from October of 2011 to May of 2012, appellant mother established living quarters with appellee in Quakertown, Pennsylvania and held herself out to the public as a single or separated individual who had entered into a committed and loving relationship with appellee. Appellant mother and appellee had planned to continue to establish living quarters with each other in appellant mother's Boothwyn residence. The testimony was evident that appellant mother and appellee quit their lease early, moved all their belongings from the Quakertown apartment, and had all their possessions packed and ready in their respective vehicles to be moved the day after Mother's Day of 2012 to the Boothwyn residence.

This court's determination of the status of the marriage between appellant mother and appellant intervener husband was not a close call or a difficult determination to render. This court heard from several witnesses testified at the two day trial hearing.

There was no question that their marriage was troubled, appellant mother's own testimony was that the marriage was in a "rough patch" when the appellant mother and appellee began their relationship. Based upon the evidence presented to this court, the "rough patch" in the marriage continued for well over a year. Appellant mother and appellant intervener husband's argument is that the court must look at whether the marriage was intact at the time of the minor child's birth. However, even if this court does look at the specific time frame, negating all the evidence and testimony regarding the lack of an

intact marriage prior to the birth of minor child, this court is still left questioning the intactness of the marriage when appellant mother and appellee had been meeting and communicating unbeknownst to appellant intervener husband. This court heard credible testimony and was presented with evidence that up until the time of minor child's birth, appellee was informed of the progress of appellant mother's labor and delivery of minor child. Although appellant mother disputes the contention and the evidence presented by appellee, this court was convinced and properly determined that appellee and appellant mother were, at a minimum, in communication with each other in the days and hours leading up to and following the birth of minor child. If appellant mother herself, or someone on her behalf was *not* in direct communication and contact with appellee; how would appellee know when appellant mother entered the hospital and gave birth to minor child, such that appellee's family was able to arrive at the hospital when appellant mother and minor child were there, but appellant intervener husband was not? How would appellee's family know what hospital appellant mother gave birth at or the time and date of that birth if there was not in contact during and following the delivery of minor child? How can the appellants' marriage be "intact" when there was that communication with appellee at that crucial time?

In such a fact-driven area of the law, where the record is replete with evidence for this court's finding, with minimal evidence for the contrary position, the appellate courts must not substitute its judgment for that of the fact-finder, who saw the witnesses and heard first-hand their testimony. *See Vargo v. Schwartz*, 940 A.2d at 467 and *E.W. v. T.S.*, 916 A.2d at 1202. This court's finding that there was no intact family and no marriage to preserve

was wholly supported by all of the evidence presented including both appellants' testimony. This court notes that appellant intervener husband provided testimony that there was no intact marriage to preserve when he candidly testified that should appellee become involved in the minor child's life it would have a devastating impact on his marital relationship and the relationship with minor child. *See* [N.T., October 7, 2013, Volume II, p. 372].

In weighing the evidence and testimony presented to this court during the two day trial, this court rendered a determination that appellant mother, a person who had deceived and continually lied to appellant intervener husband and appellee, as well as two sets of family and friends, her co-workers and probably her doctors, had *no credibility*. This court determined that appellant mother's testimony, which was offered to establish that she has or had an intact marriage at any time suggested by the defense had no credibility or any plausibility of truth. This court also determined that appellant intervener husband lacked credibility or any plausibility of truth in his testimony that there was an intact marriage. Therefore, this court determined that the presumption of paternity did not apply as the parties did not have an intact marriage.

Testimony confirmed, by overwhelming clear and convincing evidence that the appellant mother had a separate life, and a committed and lasting relationship with the appellee, as well as his extended family and friends, and did not have an intact marriage with her husband. Appellant mother, through her actions and words, had advised and represented to the public, appellee, and family and friends, that she was expecting appellee's child. Appellant mother had asserted since conception and through to the birth of minor child that appellee was the father of minor child; asserting appellee's parenthood to

all, with exception of appellant intervener husband, and guests at a baby shower that was hosted by appellant intervener husband's family.

The veracity and credibility of appellant intervener husband's testimony offered to exhibit an "intact marriage" is doubtful, not reasonable to believe, incomprehensible and beyond the realm of plausibility. With every appellate case, fact specific, the evidence in this case is overwhelming that the presumption of paternity does not attach due to clear and convincing evidence that appellant mother and appellant intervener husband did not have an intact marriage during the critical period of time examined by this court.

Since this court determined that the presumption of paternity was rebutted and/or inapplicable, this court had to render a determination as to whether the doctrine of paternity by estoppel applied. The doctrine of paternity by estoppel is the premise that regardless of biology and where there is no legal marriage, the person who has cared for the child is the parent. *K.E.M. v. P.C.S.*, 38 A.3d at 800 quoting *Brinkley v. King*, 549 Pa. at 249, 701 A.2d at 180. This court's order specifically ruled that the doctrine of paternity by estoppel was not raised as a defense by either appellant mother or appellant intervener husband. This court heard no testimony whatsoever as to any parent bonding with minor child, or even if any person has acted as a parent, or any testimony as to minor child's best interests.

## CONCLUSION:

For all of the foregoing reasons, the trial court's order of January 27, 2014 should be affirmed.