J-A17044-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| J.J. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| M.C. AND D.T. | |
| APPEAL OF M.C. | No. 412 EDA 2014 |

Appeal from the Order Entered January 27, 2014
In the Court of Common Pleas of Delaware County
Civil Division at No: 12-09900

BEFORE:  GANTMAN, P.J., PANELLA, and STABILE, JJ.

DISSENTING MEMORANDUM BY STABILE, J.:      **FILED JANUARY 09, 2015**

Because I believe the circumstances of the extramarital affair between M.C. and J.J., which occurred prior to the birth of P.T., are not sufficient to overcome the longstanding common law presumption that a child born into an intact marriage is the child of the married couple, I respectfully dissent. Binding precedent from our Supreme Court dictates that the presumption applies in this case and is irrebuttable. ***Strauser v. Stahr***, 726 A.2d 1052, 1053 (Pa. 1999).  I would therefore reverse the trial court's order.

The underlying facts are not substantially in dispute.  M.C. and D.T. are legally married and have been since June 21, 2007.  Minor Child P.T. was born on September 8, 2012, and D.T. is listed as P.T.'s father on P.T.'s birth certificate.  As explained in the Majority's Memorandum, M.C. engaged in an

extensive extramarital affair with J.J. that continued through the time of P.T.'s conception. While the trial court chronicled in detail the extramarital events leading up to the time of P.T.'s birth, the trial court found no facts to support similar conduct as of the time of P.T.'s birth and J.J.'s paternity challenge. To the contrary, the record evinces since the time of P.T.'s birth, M.C. and D.T. have reconciled, remain married, and together are raising P.T. as their child. J.J.'s paternity challenge, however, culminated in the January 27, 2014 order directing M.C., D.T., J.J. and Minor Child P.T. to undergo genetic testing.[1]

On appeal, M.C. argues the trial court failed to apply the presumption of paternity. Our Supreme Court addressed that doctrine in **Strauser**. In **Strauser**, the appellant putative father sought to establish paternity of a girl born to appellee mother during her marriage. **Strauser**, 726 A.2d at 1052-53. Appellee mother remained married to appellee husband throughout the litigation. **Id.** at 1053. Blood tests indicated a 99.99% probability of appellant's fatherhood. **Id.** The appellant alleged that appellee mother allowed him frequent visits with the child and occasionally left her in the appellant's care. **Id.** The appellees argued the presumption of paternity barred the appellant's paternity challenge. The Supreme Court wrote: "The

_____

[1] An order directing or denying genetic testing to determine paternity is immediately appealable. **Barr v. Bartolo**, 927 A.2d 635, 638-39 (Pa. Super. 2007).

presumption at issue–that a child born to a married woman is the child of the woman's husband–has been one of the strongest presumptions known to the law." *Id.* at 1054. "Traditionally, the presumption can be rebutted only by proof either that the husband was physically incapable of fathering a child or that he did not have access to his wife during the period of conception." *Id.*

> Thus, it has been held that, where the presumption applies, blood test results (existing or potential) are irrelevant unless and until the presumption has been overcome. **It has also been held that, in one particular situation, no amount of evidence can overcome the presumption: where the family (mother, child, and husband/presumptive father) remains intact at the time that the husband's paternity is challenged**, the presumption is irrebuttable. This is such a case.

*Id.* (emphasis added). "This presumption arose (a) to protect marital integrity and (b) to prevent a child from being labeled a 'bastard' child, a classification that carried both a social and a legal[2] stigma." ***Brinkley v. King***, 701 A.2d 176, 184 (Pa. 1997) (plurality) (Newman, J. concurring and dissenting). "The public policy in support of the presumption of paternity is

---

[2] At common law, children born out of wedlock could not inherit from their fathers and had no right of support from their fathers. ***Brinkley***, 701 A.2d at 184 n.3. The legal disadvantages to children born out of wedlock have been eliminated by statute. 23 Pa.C.S.A. § 5102 ("All children shall be legitimate irrespective of the marital status of their parents, and, in every case where children are born out of wedlock, they shall enjoy all the rights and privileges as if they had been born during the wedlock of their parents except as otherwise provided in Title 20 (relating to decedents, estates and fiduciaries).").

the concern that marriages which function as family units should not be destroyed by disputes over the parentage of children conceived or born during the marriage." *Id.* at 180 (Flaherty, C.J., announcing the judgment of the Court). "Third parties should not be allowed to attack the integrity of a functioning marital unit, and members of that unit should not be allowed to deny their identities as parents." *Id.*

In *Strauser*, the appellant argued the presumption should not apply because appellees' ongoing marriage was not loving and intimate and existed in "name only." *Strauser*, 726 A.2d at 1056. In other words, appellees' conduct evinced the absence of a functioning marital unit. The Supreme Court rejected that argument:

> While [a]ppellant's assertions may be factual, they are not unique. To the contrary, they indicate that the marriage of Mother and Husband, like many, has encountered serious difficulties. It is in precisely this situation, as was suggested in [*John M. v. Paula T.*, 571 A.2d 1380 (Pa. 1990), *cert. denied*, 498 U.S. 850 (1990)] that the presumption of paternity serves its purpose by allowing husband and wife, despite past mistakes, to strengthen and protect their family.

*Id.*

The *Strauser* court distinguished the facts of *Brinkley*. In *Brinkley*, the mother was married while the child was conceived, but her husband moved out before the child was born. *Brinkley*, 701 A.2d at 177. Mother was having sexual relations with putative father but not with her husband during the time of conception. *Id.* The husband filed for divorce when he learned mother was pregnant. *Id.* at 177-78. Putative father was present

at the child's birth and saw her weekly for the first two years of her life. *Id.* at 178. Putative father placed the child on his health insurance and paid some support, but mother eventually filed a complaint alleging the support was insufficient. *Id.*

Putative father argued mother could not pursue a child support action against him because she failed to rebut the presumption that her former husband fathered the child. *Id.* The Supreme Court plurality disagreed:

> In the case at bar, **at the time of the complaint for support**, there was no marriage. Lisa and George Brinkley had separated before the birth of the child and were divorced at the time of the complaint. The presumption of paternity, therefore, has no application to this case, for the purpose of the presumption, to protect the institution of marriage, cannot be fulfilled.

*Id.* at 181 (emphasis added).

In summary, the presumption applied in *Strauser*, where the married couple reconciled prior to the third party complaint. In *Brinkley*, where the married couple divorced prior to the complaint, the presumption did not apply.[3]

Justice Newman authored a concurring and dissenting opinion in *Brinkley* and a dissent in *Strauser*. She wrote: "The Majority posits that in this case, where the marriage is intact, 'public policy' requires that the presumption be irrebuttable. I disagree." *Strauser*, 726 A.2d at 1057

---

[3] The *Brinkley* court agreed unanimously that the presumption did not apply. No rationale garnered a majority.

(Newman, J. dissenting). She argued the presumption "should be open to rebuttal by reliable blood test evidence." *Id.*[4]

_____

[4] In my view, blood test evidence is irrelevant under the traditional rationale for the presumption. As explained in the main text, the presumption was created to protect marriages and to protect children from the ramifications of illegitimacy. While the legal consequences of illegitimacy have been removed by statute, the goal of protecting an intact marriage remains the policy of this State, as per the Majority opinion in *Strauser*. Admission of blood test evidence does not advance that goal. This debate has been ongoing at least since the 1950's. *See Commonwealth ex rel. O'Brien v. O'Brien*, 136 A.2d 451, 453-54 (Pa. 1957) (noting the admissibility into evidence of blood grouping tests in certain cases, though not those where the presumption applies).

Concerning the goal of protecting an intact marriage, Justice Newman, however, advanced the following argument in *Brinkley*:

> The goal of protecting marital integrity is also futile in a society where legal marital status does not always translate into a loving, intimate, monogamous relationship. The presumption that a child born to a married woman is a child of the marriage is dubious at best and in many cases, such as here, is absurd. We are living a fable, both morally and legally, if we think that a family is typified by 'Father Knows Best,' where parents and children love and respect each other and where husband and wife are faithful to each other and adultery is merely a figment of one's imagination. Thus, the presumption that a child born during coverture is a child of the marriage has lost its place in modern society, especially considering the scientific testing available both to prove and to disprove paternity.

*Brinkley*, 701 A.2d at 185 (footnote omitted). Justice Newman's argument has yet to garner the support of a majority of the Supreme Court. As an intermediate court of appeals, we must faithfully apply binding Supreme Court precedent.

Justice Newman argued the majority's irrebuttable presumption contradicted the Uniform Act on Blood Tests to Determine Paternity, 23 Pa.C.S.A. § 5104(c). That statute provides, in relevant part, as follows:

> (c) Authority for test. --In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others and the interests of justice so require.

23 Pa.C.S.A. § 5104(c). Justice Newman believed, therefore, that the **Strauser** majority's public policy pronouncement contradicted that of the legislature, as set forth in § 5104(c). She argued the Supreme Court was not the appropriate body to make such public policy pronouncements, especially in light of advances in scientific evidence. "We would be both naïve and remiss to perpetuate the strength of this presumption and ignore the results of reliable scientific tests." **Strauser**, 726 A.2d at 1058 (Newman, J. dissenting).[5]

_____

[5] The Supreme Court assessed the relationship between the presumption and the Act in **John M.** The **John M.** court held that the Act does not permit a putative father who stands outside the marriage to compel the husband/presumed father to submit to blood tests. **John M.**, 517 A.2d at 1385. "Alleged father," as that term is used in § 5104(c) (the **John M.** opinion refers to 42 Pa.C.S.A. § 6133; it has since been renumbered), does not refer to the husband/presumed father. **Id.** The **John M.** court reasoned

*(Footnote Continued Next Page)*

Courts continue to rely on **Strauser** in applying the presumption of paternity. For example, in **E.W. v. T.S. and C.S.**, 916 A.2d 1197 (Pa. Super. 2007), the putative father sought custody of a child born during the marriage of husband and mother. Mother had an affair with putative father during her marriage to husband, and she was sexually active with both men throughout the time of conception. **Id.** at 1199-1200. Mother told both putative father and husband the child was his. **Id.** at 1200. Husband was present at the birth and baptism and assumed all parental duties. **Id.** Mother and husband never filed for divorce and intended to continue their marriage. **Id.** This Court affirmed the order dismissing putative father's custody complaint because he could not overcome the presumption. **Id.** at 1206. Citing **Strauser**, this Court reasoned: "[T]he **Strauser** Court recognized that in a situation where a marriage into which a child is born

_(Footnote Continued)_ ————————————

that the presumption remained valid after the passage of the Act because the presumption protects the interests of the mother, the husband, the family unit and it facilitates the Commonwealth's interest in protecting the family unit. **Id.**

> There is, in short, a family involved here. A woman and a man who have married and lived together as husband and wife, giving birth to and raising four children, have obvious interests in protecting their family from the unwanted intrusions of outsiders (even ones who have had serious relationships with the mother, father or children). The Commonwealth recognizes and seeks to protect this basic and foundational unit of society [. . .] by the presumption that a child born to a woman while she is married is a child of the marriage.

**Id.** at 1386.

continues and, despite marital problems, the mother and her husband never separated and 'have chosen to preserve their marriage and to raise as a family the . . . children born to them. . .' the presumption continues to apply." *Id.* at 1201 (internal citation omitted).

In *C.W. v. L.V. and G.V.*, 788 A.2d 1002 (Pa. Super. 2001), this Court addressed facts similar to those of *E.W.* Specifically, mother and husband never separated, were sexually active during the time of conception, the child was born during their marriage, husband was present at the child's birth, husband was named father on the birth certificate, and husband assumed parental responsibilities. *Id.* at 1006. The *C.W.* court quoted with approval the trial court's description of an intact family and held that the presumption applied:

> An intact family is a family that is a functional family; let's put it that way, as opposed to a dysfunctional family. When a child lives in a household and has two parents there on a regular, recurring basis and who interacts with each other on a daily basis. And with all the normal things that go on in families, the discipline, communication, the making of meals, going to bed at night, getting up in the morning. And interaction with other community things; church, extended family.

*Id.* at 1005.

Nonetheless, application of the presumption continues to draw criticism, especially given readily obtainable scientific evidence confirming or refuting a putative father's parentage. In *Vargo v. Schwartz*, 940 A.2d 459, 461 (Pa. Super. 2007), four children were born to a married couple, and the mother filed suit against the putative father for support of the two

girls born to the marriage. Consensual genetic testing confirmed that putative father, not the husband, fathered the two girls. *Id.* Putative father argued that, in the eyes of the law, the husband was the father of the two girls based on the presumption of paternity. *Id.* Putative father also argued that the mother was estopped[6] from seeking support from him because she and her husband held the girls out as their own. *Id.*

Citing *Brinkley*, the *Vargo* court noted that "the presumption of paternity applies *only* where the underlying policy to preserve marriages would be advanced by application of the presumption." *Id.* at 463 (emphasis in original; citing *Brinkley*, 701 A.2d at 181). Thus, the presumption applies only where it can preserve an intact marriage. *Id.* The Vargos separated several times during their marriage, including after the mother revealed to her husband that the two girls were not his. *Id.* at 467. The husband stayed with the mother only when he had nowhere else to go. *Id.* The mother filed for divorce, though the divorce was not final as of the time of the support hearing.[7] *Id.* Under these circumstances, we did not

---

[6] Paternity by estoppel may apply if the presumption of paternity is inapplicable or has been rebutted. *Id.* at 464. Given the circumstances of the case on appeal, this Court has no occasion to analyze paternity by estoppel.

[7] The *Vargo* opinion indicates the mother filed her support complaint in February of 2004 and her divorce complaint in November of 2003. *Id.* at 461, 467 n.4. Thus, the divorce action was pending prior to the paternity challenge. The *Vargo* court noted that the "presumption of paternity is
*(Footnote Continued Next Page)*

disturb the trial court's finding that the Vargo's did not have an intact marriage. *Id.* We therefore affirmed the trial court's holding that the presumption of paternity did not apply. *Id.; see also Martin v. Martin*, 710 A.2d 61, 62 (Pa. Super. 1998) (presumption not applicable where a paternity challenge–pertaining to a child born during the mother's second marriage but conceived during her first–post-dated the married couple's separation); *Jones v. Trojak*, 634 A.2d 201, 207 (Pa. 1993) (presumption overcome where the husband was impotent and not sexually involved with the wife during the time of conception).

M.C. and D.T. rely heavily on *B.S. v. T.M.*, 782 A.2d 1031 (Pa. Super. 2001), where the trial court refused to apply the presumption to a couple who remained married at the time of the paternity challenge. There, the mother separated from her husband briefly after she became pregnant with putative father's child and remained separated from him, living with her parents, until after the child's birth in May 1999. *Id.* at 1032-33. Putative father was present at the birth, named as the father on the child's birth certificate, participated in the child's baptism as his father, and purchased a life insurance policy to provide for the child in the event of the putative father's death. *Id.* at 1033. Putative father and mother voluntarily

(Footnote Continued) _____

unrebuttable when, **at the time the husband's paternity is challenged**, mother, her husband, and the child comprise an intact family wherein the husband has assumed parental responsibilities for the child." *Id.* at 463 (emphasis added).

- 11 -

underwent paternity testing and were aware of the results. *Id.* at 1032. Mother filed a complaint in divorce in February of 1999, but withdrew it on September 13, 1999. *Id.* at 1033.

In June of 1999, mother abruptly ended her romantic relationship with putative father. Her posts on an Internet board indicated she was considering reconciling with her estranged husband and moving in with him in order to improve her legal position with respect to the child born of her relationship with putative father. *Id.* at 1034. Putative father sought to preserve his rights by filing a petition for special relief on September 9, 1999 and a complaint for partial custody on September 21, 1999.

In ruling the presumption inapplicable, this Court reasoned: "Here, [mother] and [husband] separated from the time of [child's] conception until well after birth, a period of approximately one year." *Id.* at 1036. "During that time, [mother] acted as if the separation would be permanent and she would be with [putative father] indefinitely." *Id.* "Additionally, [putative father] undertook the role of father." *Id.* The *B.S.* court considered the facts before it to fall somewhere in between *Strauser*, where the marriage remained intact at all times, and *Brinkley*, where the marriage had ended before any party asserted the presumption of paternity. *Id.* "Here, after living apart for one year, [mother and husband] reconciled and then sought to apply the presumption in order to defeat [putative father's] paternity claim." *Id.* Essentially, mother and husband "voluntarily gave up the

- 12 -

benefit of the presumption for approximately one year after which they claimed the benefits of its existence for the first time." *Id.* at 1037.

Cognizant of the ***Brinkley*** court's reasoning that the presumption does not apply where its purpose–to protect a marriage–cannot be fulfilled, the ***B.S.*** court determined that the presumption did not apply. No dispute existed as to the child's parentage, and the court did not believe putative father's custody petition would do further harm, "as this hellish marital situation has already occurred." *Id.* at 1036-37. Thus, the Court reasoned the "marriage will succeed or perhaps will fail with or without the application of the presumption." *Id.* at 1037. Finally, the ***B.S.*** court reasoned "application of the presumption could have a deleterious effect on [mother and husband's] family, especially on [child], in the future." *Id.* at 1037.

The instant facts do not mesh perfectly with any of the foregoing precedents. M.C.'s conduct during the pregnancy plainly evinced an intent to raise the child-to-be with J.J. Nonetheless, M.C. did not entirely separate herself from the marriage to D.T., instead leasing an apartment with J.J. and spending part of the week with him and the remainder in the marital home. For whatever reason, this arrangement failed to arouse the suspicion of D.T. M.C. and D.T. never filed for divorce, and they reaffirmed their marriage as of the time of P.T.'s birth despite M.C.'s adulterous relationship with J.J. Additionally, D.T. has assumed parenting responsibility for D.T., despite his knowledge of the strong possibility that J.J. is the biological father.

In summary, the record evinces M.C. and D.T.'s apparent reconciliation and intent to remain together and raise P.T. In this regard, the facts align themselves with *Strauser* and *E.W.* Despite M.C.'s lack of fidelity to the marriage, *the apparent reconciliation predated both P.T.'s birth and J.J.'s paternity challenge.* As noted above, *Strauser* indicates that the inquiry into an intact marriage must take place as of the time of the paternity challenge. *Strauser*, 726 A.2d at 1054. *Vargo* reiterated that proposition. *Vargo*, 940 A.2d at 463. Following *Strauser*, this Court in *E.W.* applied the presumption of paternity where the married couple chose to reconcile despite the marriage's troubled past.

*Vargo*, however, teaches that the existence of an intact marriage is a finding of fact and thus within the province of the trial court. Here, the trial court found no intact marriage and that M.C., given her highly duplicitous conduct, had no credibility as a witness. Essentially, the trial court found that the reconciliation of M.C. and D.T. was a sham and therefore no impediment to compelling blood tests. Under the Majority's analysis, this is the end of the matter.

In my view, based on the applicable law and the record before us, the trial court lacked authority to deem M.C. and D.T.'s reconciliation a sham. Our case law provides very limited authority for such action, as in *B.S.* and *Vargo*. Both cases are distinguishable. In *B.S.*, mother posted on an Internet board that she was reuniting with her husband in order to improve

her legal position with respect to the child of her adulterous affair. Thus, the record contained direct evidence of the mother's ulterior motives for the reconciliation. Further, the putative father was present at the birth, was named on the child's birth certificate, and lived with the mother and assumed parenting duties for one year. Further, the mother in **B.S.** filed a complaint for divorce, withdrawing it only one week before putative father's custody complaint, and several days after putative father's petition for special relief. Similarly, in **Vargo**, the couple separated and the mother filed for divorce prior to the paternity challenge. None of these circumstances is present instantly.

When a married couple reconciles prior to a paternity challenge and raises the child as part of the marital family unit, as happened here, **Strauser** indicates the presumption of paternity–which is simply a legal fiction–applies and is irrebuttable. **Strauser** recognized that parties to a seemingly ruined marriage sometimes resolve their differences and remain together. The **Strauser** Court expressly rejected putative father's argument that the marriage existed in name only, despite the married couple's troubled past. **Strauser**, 726 A.2d at 1056.

I recognize that the trial court judge conducted an extensive review of M.C.'s duplicitous and adulterous conduct prior to P.T.'s birth, and I do not quibble with the trial court's findings of fact or with its credibility determinations. Under controlling law, however, M.C.'s duplicity during the

adulterous affair does not, indeed cannot, control the outcome of this case. The record plainly indicates that M.C. and D.T. lived together at the time of the birth, and welcomed P.T. into their marriage as their child. These facts are not in dispute, and they are not altered by the trial court's well-founded rejection of M.C.'s credibility.

Every case in which the presumption of paternity is at issue will involve a marriage that was troubled at some time. The presumption of legitimacy cannot arise absent the occurrence, or at least an allegation, of an adulterous affair. In every case, the trial court will have a potential basis to reject the credibility of the mother of a child whose paternity is in dispute. In no case will there be any guarantee of a lasting reconciliation.

Under the Majority's analysis, trial courts will have seemingly unfettered discretion to reject a married couple's reconciliation based on prior duplicitous conduct. To permit this state of affairs is to render the presumption of paternity meaningless, as trial courts will have discretion to apply it–or not–based on their assessment of the authenticity of a marital reconciliation. My review of **Strauser** and its progeny convinces me that the presumption of paternity exists precisely to give reconciled married couples a chance to succeed in their marriage despite prior infidelities and without interference from a third party. In my view, the Majority and the trial court have erred in failing to apply the presumption of paternity in this case.

I am aware that the presumption of paternity has long been under attack as unworkable and unfair, given advances in the science of paternity testing and the prevalence in modern society of divorce and children born out of wedlock. I further recognize the difficulty in consistent application of the presumption as well as the difficulty in defining an "intact" marriage and discerning whether the presumption of paternity will in fact protect the marriage in question. Perhaps the time has come to dispense with the presumption entirely, or to reassess the circumstances under which it is applicable and can be rebutted. If so, such action must come either from our Supreme Court or from the General Assembly. In light of all of the foregoing, I would vacate the order on appeal.

I respectfully dissent.