*1199 OPINION BY
BENDER, J.:
¶ 1 E.W. appeals from the order entered on April 7, 2006, that granted T.S.’s and C.S.’s motion to dismiss E.W.’s complaint for custody and his petition to establish paternity of G. on the basis that E.W. lacked standing.[1] We affirm.
¶2 Preliminarily, we note that E.W. filed a complaint for custody of G. on December 2, 2005, against T.S., who as part of her answer to the complaint, raised as new matter, the allegation that E.W. had no standing to seek custody. C.S., T.S.’s husband, petitioned to intervene, contending that he is G.’s father. On January 5, 2006, E.W. filed a petition to establish paternity and for genetic testing, based upon his belief that he is G.’s natural father. T.S. filed a motion to dismiss E.W.’s petition, again asserting that E.W. had no standing. Subsequently, the parties stipulated that C.S. would be a party to the action, and that C.S. and T.S. “had been married at the time of conception and birth of [GJ, and that [C.S.] claimed to be [G.’s] father.” Trial Court Opinion (T.C.O.), 4/7/06, at 2.[2]
¶ 3 Two days of hearings were held in February of 2006 to determine whether E.W. had standing to proceed with the custody action, i.e., whether the presumption of paternity bars E.W. from seeking to establish that he is G.’s father. The trial court summarized the facts as follows:
The evidence elicited established that [C.S.] and [T.S.] were married on April 15, 2000, and that they are the natural parents of a three-year-old child, [D.], born November, 2002. [C.S.] is also named as father on the birth certificate of [G.], born March 25, 2004. [C.S. and T.S.], further, maintained and engaged in a sexual relationship within the period surrounding the date of conception of [G.].
However, [T.S.], who had begun a relationship with [E.W.] in May, 2003, likewise, was sexually intimate and had engaged in such relations with [E.W.] during the time-frame encompassing the conception of [G.]. As [C.S.] worked in Allentown-a distance from [T.S.’s and C.S.’s] home-and, at times, stayed overnight at his parents’ home which was near to his work, and, as [E.W.] and [T.S.] worked for the same employer, the latter were able to conduct their affair rather openly and yet conceal it from [C.S.]. In fact, on some occasions, [E.W.] stayed over night at [T.S.’s and C.S.’s] home while [C.S.] was working in Allentown. The relationship between [T.S.] and [E.W.] finally ended in August, 2005. During the relevant period of time, [T.S. and C.S.] resided in Brock-ton, Schuylkill County, and [E.W.] resided in Pottsville, Schuylkill County.
[C.S.] remained unaware of the illicit relationship in which his wife had been engaging until August, 2005, after [T.S. and C.S.] had returned from a family vacation and [E.W.] had called [T.S.’s and C.S.’s] home and informed [C.S.] of the relationship. [E.W.] previously had threatened [T.S.] of his intention to do so when [T.S.] considered terminating the relationship with [E.W.]. Following the telephone call from [E.W.], [C.S.] asked his wife if he ([C.S.]) was the father of [G.]. [T.S.] responded that she *1200 believed he ([C.S.]) was [G.’s] father. Although [C.S.] subsequently investigated having a paternity test done via a process advertised on the internet, and did follow through with such testing, he threw away the papers he received indicating the testing results before analyzing them. At the time, [C.S.] did not desire to know the results as he simply insisted that he was [G.’s] father.
Following the August, 2005, telephone call, and, again, without [C.S.’s] knowledge, [T.S.] took [G.] to see [E.W.], generally once a week, until [E.W.] instituted the custody action. The visits then stopped until, again, without informing her husband, [T.S.] allowed [E.W.] to visit with [G.] on a day after Christmas, 2005. Nevertheless, the affair with [E.W.] never resumed after August, 2005.
Two to three months before [G.] was born, [T.S.] had also stopped seeing [E.W.]. However, a few months after [G.] was born, [T.S.] told [E.W.] that he was the father of [G.], resumed the illicit relationship and allowed [E.W.] to see [G.], generally by taking [G.] to visit [E.W.] at his parents’ home where he lived. [T.S.] sent a Valentine’s Day card to [E.W.] indicating that he was the father of [G.] and allowed [G.] to reference [E.W.] as “Daddy” and [E.W.’s] parents as “Nanny” and “Poppy.” [T.S.] also led members of [E.W.’s] family and some of her and/or [E.W.’s] friends or co-workers to believe [E.W.] was [G.’s] biological father. Up until August, 2005, [T.S.] was not forthright to [E.W.’s] relatives about her marital status, letting them believe that she had been divorced and/or separated from her husband. [T.S.] frequently visited [E.W.’s] home with [G.] and allowed [E.W.] to spend time alone with [G.] — generally, on Mondays when [E.W.] was not working. [E.W.] and his family became attached to [G.] and, unquestionably, care for her.
However, [T.S.] similarly represented to her husband that he was the father of [G.], and until August, 2005, he had no reason to believe otherwise. [C.S.] was present in the hospital at [G.’s] birth, he was named on [G.’s] birth certifícate as her father, was present for [G.’s] baptism, was named as [G.’s] father on her baptismal records, has covered [G.] on his health insurance at all times and has always supported [G.]. [C.S.] further
insists that both [G.] and [D.] are his children. Throughout their marriage, [T.S. and C.S.] have filed income tax returns jointly and shared bank accounts, residences and mailing addresses, attended church and vacationed as a family. [T.S.] has always been the named beneficiary on [C.S.’s] life insurance policy and is named on the same automobile insurance plans as those of her husband. [C.S. and T.S.] never separated or filed for divorce and want to maintain their marriage. Although only learning many details of the extent of his wife’s affair and deception during the hearings herein, [C.S.], nevertheless, believes his marriage is strong. He loves his wife and the children [D.] and [G.]. He supports his wife and believe[s] her inappropriate actions may have been the result of post-partum depression and threats from [E.W.].
T.C.O. at 2-5. The court, relying on Strauser v. Stahr, 556 Pa. 83, 726 A.2d 1052 (1999), determined that E.W. had not rebutted the presumption of paternity and that, therefore, T.S.’s motion to dismiss the custody complaint for lack of standing was properly granted as was the dismissal of E.W.’s petition to establish paternity and for genetic testing.
¶ 4 E.W. now appeals to this Court, setting forth the following issues for our review:
*1201 A. Whether the trial court erred in concluding that [T.S.’s and C.S.’s] marriage was intact, and that they never separated?
B. Whether the trial court erred in concluding that [E.W.] failed to rebut the presumption of paternity?
C. Whether the trial court erred in finding that the policy underlying the presumption of paternity supported denying [E.W.] standing?
D. Whether the trial court erred in prohibiting [E.W.] from pursuing questions regarding DNA testing [C.S.] voluntarily submitted to?
E. Whether the trial court erred in concluding that [E.W.] could not assert a claim of custody based on that he acted in loco-parentis to the child?
F. Whether the trial court erred in failing to address the issue of whether [T.S. and C.S.] should be estopped from denying [E.W.’s] paternity?
T.S.’s and C.S.’s brief at 2.
¶ 5 In order to respond to the issues raised, we are guided by the following:
The presumption that a child born during the marriage is a child of the husband is always the starting point in a contest involving the parentage of a child born during coverture. Moreover, the strength of the presumption that a child born to a married woman is a child of the marriage is grounded in the Commonwealth’s interest in protecting the family unit. Although the presumption may be rebutted by clear and convincing evidence of husband’s non-access, impotency, or sterility, the presumption is irrebuttable where mother, child, and husband live together as an intact family and husband assumes parental responsibility for the child.
B.S. and R.S. v. T.M., 782 A.2d 1031, 1034 (Pa.Super.2001) (citations omitted). Additionally, in Strauser, our Supreme Court discussed its prior plurality decision in Brinkley v. King, 549 Pa. 241, 701 A.2d 176 (1997), which noted that the fundamentals of presumptive paternity include the principle that “the presumption is irrebuttable when a third party seeks to assert his own paternity as against the husband in an intact marriage.” Strauser, 726 A.2d at 1054. The Strauser court further discussed the Brinkley court’s explanation that “[t]he public policy in support of the presumption ... was ‘the concern that marriages which function as family units should not be destroyed by disputes over the parentage of children conceived or born during the marriage.’ ... Thus, ‘third parties should not be allowed to attack the integrity of a functioning marital unit, and members of that unit should not be allowed to deny their identities as parents.’ ” Strauser, 726 A.2d at 1054-55 (citation omitted).
¶ 6 In addition to setting forth the above from the lead opinion in Brinkley, the Strauser court also reviewed the positions of the other Justices, which reflect criticism directed toward the pi'esumption of paternity. However, the Strauser court recognized that in a situation where a marriage into which a child is born continues and, despite marital problems, the mother and her husband never separated and “have chosen to preserve their marriage and to raise as a family the ... children born to them ...” id. at 1055, the presumption continues to apply. The Strau-ser court stated that “the present case comes within the limited set of circumstances in which, according to the Brinkley plurality, the presumption of paternity continues to apply. In this case, moreover, the presumption is not rebuttable.” Id. at 1055-56.
*1202 ¶ 7 E.W.’s first argument is presented in seven parts with each section reviewing the testimony of various witnesses in an effort to overcome the trial court’s conclusion that G. was conceived and born during an intact marriage which continues to this day and that C.S. and T.S. were never separated. Obviously, E.W. chooses to highlight testimony that he believes will support a conclusion opposite to the one deduced by the court, ie., that C.S. and T.S. were separated and that, therefore, their marriage was not intact on a continuing basis. E.W. however fails to recognize that despite contradictory testimony, it is the trial court as the fact finder who is entitled to weigh the evidence and assess the credibility of the witnesses. B.S., 782 A.2d at 1087. Furthermore, “[t]he finder-of-fact is free to believe all, part, or none of the evidence, and [a reviewing] court will not disturb the trial court’s credibility determinations.” Id. Having reviewed the extensive record, we conclude that the trial court’s findings are supported by the evidence presented.
¶ 8 E.W.’s next argument concerns the trial court’s conclusion that E.W. failed to rebut the presumption of paternity. E.W. relies on subsections (c) and (g) of the Uniform Act on Blood Tests to Determine Paternity (“Uniform Act”), 28 Pa.C.S. § 5104, contending that “the plain language of Section 5104, ... provides that blood testing is relevant, and that the presumption of legitimacy is overcome if the court finds that the conclusions of all experts show that the husband is not the father.” E.W.’s brief at 25.[3] Those two provisions provide:
(c) Authority for test.-In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon sug-gestión made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others and the interests of justice so require.
(g) Effect on presumption of legitimacy.-The presumption of legitimacy of a child born during wedlock is overcome if the court finds that the conclusions of all the experts as disclosed by the evidence based upon the tests show that the husband is not the father of the child.
23 Pa.C.S. § 5104(c) and (g).
¶ 9 Specifically, E.W. argues that the courts of this Commonwealth have ignored the language of the Uniform Act and as a result have denied E.W.’s statutory right to have a blood test performed so that he can overcome the presumption of paternity. The Strauser opinion recognizes in a footnote that:
In her dissenting opinion, Madame Justice Newman discerns a conflict between this holding and the Uniform Act on Blood Tests to Determine Paternity, now codified at 23 Pa.C.S. § 5104, which she views as codifying the public policy that blood testing may always be employed to rebut the presumption of paternity. Such position, however, has never commanded a majority of this Court. See John M. [v. Paula T.], 524 *1203 Pa. 306, 571 A.2d [1380,] at 1385 [ (Pa.1990) ] (stating that “section 6133 of the Act [now 23 Pa.C.S. § 5104(c) ] does not give the putative father the right to compel a presumptive father (husband) to submit to blood tests”); see also John M., 571 A.2d at 1389 (Nix, C.J., concurring, and joined by all others) (declaring that “a third party who stands outside the marital relationship should not be allowed, for any purpose, to challenge the husband’s claim of parentage”).
Strauser, 726 A.2d at 1056 n. 2.
¶ 10 Despite E.W.’s discussion regarding the “clear and unambiguous” language of the Act, which he contends should not be ignored by the courts, E.W. has not provided any citation to a case that has allowed a third party seeking to rebut the presumption to compel the presumed father to submit to a blood test. Nor has this Court located any case law that would support E.W.’s position. Therefore, we must conclude that this issue is without merit.
¶ 11 E.W. next relies on B.S., a ease in which this Court affirmed the trial court’s refusal to apply the presumption of paternity. On appeal, our Court summarized the trial court’s findings and its reasoning as follows:
First, the trial found that there is no dispute from which R.S. [husband] and B.S. [mother] need to be protected. According to the trial court, the evidence failed to establish that there is or ever was a dispute about the identity of J.’s [child] biological father. The court looked to the actions of the parties from mid-September 1998 to September 1999 to support its conclusion. Those actions included: B.S. left the marital home after learning she was pregnant; B.S. and T.M. [paramour] looked for a house together; B.S. filed for divorce from R.S.; T.M. was present at J.’s birth and was named as J.’s father on the acknowledgment of paternity form provided by the hospital; T.M. added J. to his health insurance coverage immediately after her birth; and T.M. participated as J.’s father in the baptism ceremony. Additionally, the court rejected the testimony of R.S. and B.S. that there was doubt in their minds about the identity of the biological father....
Second, the trial court determined that if this case is permitted to proceed on T.M.’s petition for partial custody, that there would be no harm to R.S. and B.S.’s relationship, as this hellish marital situation has already occurred. The parties in this marriage have already acknowledged the affair and subsequent birth of J., the public separation, and B.S.’s holding T.M. out as the father of J. This marriage will succeed or perhaps fail with or without the application of the presumption. The trial court said it best: “Admittedly, there may be unpleasantness for [R.S.] and [B.S.] arising from [T.M.’s] exercising rights of partial custody (if he is the biological father), but the law is not intended to protect them against all such unpleasantness ....
Third, the trial court found that application of the presumption could have a deleterious effect on B.S. and R.S.’s family, especially on J., in the future. The court opined, “The world knows of the appearance of things between September 1998 and September 1999. If R.S.’s biological fatherhood is a fiction, it will not be maintained. If J. eventually finds out that the truth is different from what she has been led to believe for a period of years, she may suffer greater trauma than if she knows it from the outset.” ...
Cases such as this fall on their unique set of facts. B.S. and R.S. voluntarily gave up the benefit of the presumption for approximately one year after which *1204 they claimed the benefits of its existence for the first time. The damage to their marriage is “water under the bridge.” R.S. and B.S. reconciled with full knowledge of all the facts. T.M. assumed the responsibilities he believed were his as J.’s father until he was no longer permitted to do so. At that point, he took immediate steps to assert his rights in court.
B.S., 782 A.2d at 1036-37.
¶ 12 Contrasting the facts found by the trial court in B.S. with those found by the trial court in the instant case reveals a distinction that can not be reconciled. Here, T.S. did not move out of the marital home seeking to establish living quarters with E.W., nor was a divorce complaint filed. Moreover, C.S. fulfilled all the duties of a father in connection with the birth and religious rites. And most telling as the court found based upon the evidence, C.S. and T.S. did not separate. Accordingly, we are compelled to conclude that the situation here is sufficiently distinct from that in B.S. and we, therefore, conclude that the trial court’s application of the presumption of paternity was proper.
¶ 13 E.W. next argues that the court erred in limiting his attempts to pursue questions about the DNA test and its results, claiming that these questions were relevant in light of the provisions of the Act and his belief that T.S. and C.S. knew the results of the test. The trial court responded to this argument by stating:
Next, [E.W.] contends that the alleged DNA testing likely confirmed that [E.W.] was the father of [G.] and, therefore, the policy surrounding the existence of the presumption of paternity was not supported by denying [E.W.] an opportunity to learn the results of the testing.... In addition to hearsay issues, the evidence, again, did not establish that any DNA testing had actually been performed by a reputable laboratory, or otherwise, and, per [C.S.], he threw away the written test results before he analyzed them. In any event, the policy surrounding the presumption of paternity includes the protection of the institution of marriage from a paternity dispute involving a child conceived, born and living with an intact family. Pennsylvania appellate courts have deemed it inappropriate for a court to allow the pursuit of genetic testing in situations where the presumption of paternity applies. Importantly, [E.W.] not only failed to identify how the policy surrounding the presumption of paternity had not been implicated in this case, but the evidence clearly established that the policy of protecting the institution of marriage from third party paternity claims was present.
Trial Court Opinion, 6/19/06, at 4. We are compelled to agree with the trial court and also note that E.W. has not cited any case law that would persuade this Court otherwise. Thus, we conclude that E.W.’s fourth issue is without merit.
¶ 14 E.W.’s next argument centers on the court’s conclusion that E.W. could not assert a claim of custody based on in loco parentis status. Again, we turn to the trial court’s discussion of this issue and affirm on that basis.
[E.W.] further contends that this court erred when it concluded that a claim by [E.W.] for custody, based on his allegedly having stood in loco paren-tis to the child, could not proceed.... As stated by [E.W.], in a footnote to its [original], opinion, this court observed that [E.W.] made a request to proceed with the custody case on the theory of having in loco parentis status in his brief filed at the end of the proceedings. Such claim was disallowed as not legally *1205 sustainable and, farther, as belated, having not been raised or pursued at the beginning of the case or during the hearings. In the transcript of the hearings, however, it is noted that the claim of in loco parentis has been mentioned twice during the hearings held on three petitions before the Court — [C.S.’s] Petition to Intervene in [E.W.’s] custody action, [T.S.’s] Motion to Dismiss [E.W.’s] custody action based on [E.W.’s] lack of standing, and [E.W.’s Petition to Establish Paternity and for Genetic Testing — although the in loco parentis claim had not been set forth in [E.W.’s] written court filings preceding the hearings.
More specifically, following an “intact family” relevancy objection made by [T.S.’s and C.S.’s] counsel to the question whether [T.S]. publicly had held [E.W.] out to be the father of [G.] (posed by [E.W.] during cross-examination of [T.S.]), the court overruled the objection, noting that the issue of “intact family” was a question of fact for it to decide. [E.W.’s] counsel then commented, “there’s an issue here of in loco parentis as well.” (Transcript pg. 45). Further, at the end of the hearings, in a brief response to the court’s inquiry about the presumption of paternity, [E.W.’s] counsel contended that if the presumption were found not rebutted, [E.S.] “is afforded standing under the in loco parentis rules.” (Transcript pg. 272).
In deciding the matter, this court determined that [E.W.] would not be allowed to pursue such a standing claim and thereby circumvent the law applicable to the societal interest in preserving marital units, as his alleged in loco par-entis status was attempted to be established through deception, practiced upon and/or without the knowledge of the parent whose role [E.W.] sought to replace. In his statement of complaints on ap-
peal, [E.W.] claims that, regardless of the motives or knowledge of others, a person can act in loco parentis.[2] Contrary to [E.W.’s] contention, however, the law provides that in loco parentis status cannot be achieved without the consent and knowledge of, and in disregard of the wishes of a parent. See, e.g. T.B. v. L.R.M., 567 Pa. 222, 786 A.2d 913 (2001) (third party cannot achieve in loco parentis status in defiance of parents’ wishes and the parent/child relationship).
Trial Court Opinion, 6/19/06, at 4-6.
¶ 15 Lastly, E.W. argues that the court should have addressed whether T.S. and C.S. were estopped from denying E.W.’s paternity. This argument flies in the face of case law that essentially holds the opposite position from the one espoused by E.W. “Where the presumption of paternity does not apply, the question of the application of the doctrine of estoppel arises.” Weidman v. Weidman, 808 A.2d 576, 577 (Pa.Super.2002) (emphasis added). The trial court recognized that when the presumption of paternity does apply then the doctrine of estoppel is not relevant. That is the situation in the present matter. The trial court explained:
[E.W.] finally contends that this court failed to address the estoppel issue in that it did not consider whether [T.S. and C.S.] should be estopped from denying [E.W.’s] paternity.... The issue of estoppel, however, does not arise unless the presumption of paternity has been rebutted or is inapplicable in the circumstances. Herein, the presumption of paternity was found to apply and de *1206 termined not to have been rebutted. Consequently, there existed no basis to consider any issue of estoppel.
Trial Court Opinion, 6/19/06, at 6.
¶ 16 Accordingly, for the reasons stated above, we conclude that the trial court’s order should be affirmed.
¶ 17 Order affirmed.

. Although the record and the briefs identify the parties by their full names, we will identify the parties in both the caption and in this memorandum by their initials to preserve their privacy. See In the Interest of R.C., 427 Pa.Super. 196, 628 A.2d 893, 894 (1993).

. The opinion dated April 7, 2006, was issued by the court in connection with its order that is now the subject of the appeal. A subsequent opinion was issued on May 23, 2006, in response to the issues raised by E.W. in his concise statement of matters complained of on appeal. See Pa.R.A.P. 1925.

. We nóte that E.W.’s petition seeking genetic testing was filed pursuant to 23 Pa.C.S. § 4343 and did not present a claim under the Uniform Act relied upon in his brief.

 Notably, in loco parentis status also requires the assumption of parental obligations. Testimony did not establish [E.W.] assumed the obligation incident to a parental relationship with [G.], i.e. support, etc.