J-A31016-14

| | |
|---|---|
| B.J.B. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| T.G. AND W.G, | |
| Appellee | No. 868 MDA 2014 |

Appeal from the Order Entered April 21, 2014
In the Court of Common Pleas of Schuylkill County
Civil Division at No(s): S-1628-2013

BEFORE:  BOWES, J., OTT, J., and STABILE, J.

CONCURRING MEMORANDUM BY BOWES, J.:    **FILED JANUARY 21, 2015**

I concur with the learned majority's disposition and join the entirety of its cogent and well-reasoned statement of rationale.  I write separately only to emphasize my perspective that scientific advancements and the evolving perception of family have relieved the need for our continued mechanical application of the presumption of paternity doctrine, which I believe is outdated.

The only surviving purpose of the presumption of paternity, which was formally referred to as the presumption of legitimacy, is to protect the sanctity of an intact family unit.  As former Chief Justice Flaherty reiterated in the opinion announcing the judgment of the court in **Brinkley v. King**, 701 A.2d 176, 180 (Pa. 1997) (plurality) (Nigro, J., and Newman, J.,

concurring and dissenting separately), "[t]he public policy in support of the presumption of paternity is the concern that marriages which function as family units should not be destroyed by disputes over the parentage of children conceived or born during the marriage. Third parties should not be allowed to attack the integrity of a functioning marital unit, and members of that unit should not be allowed to deny their identities as parents." The High Court restated these policy concerns two years later in *Strauser v. Stahr*, 726 A.2d 1052, 1054 (Pa. 1999) (Nigro, J., and Newman, J., dissenting separately), in holding that "where the family (mother, child, and husband/presumptive father) remains intact at the time that the husband's paternity is challenged, the presumption is irrebuttable." *See also id*. at 1055-1056.

Herein, the majority concludes, and I am constrained to agree, that our Supreme Court's holding in *Strauser*, *supra* and this Court's rationale in *E.W. v. T.S.*, 916 A.2d 1197 (Pa.Super. 2007), precluded Appellant, a third party, from invoking the Uniform Act on Blood Tests to Determine Paternity, 23 Pa.C.S. § 5104, to challenge the presumption of paternity in this case. Thus, although I find intellectually compelling Appellant's assertion that § 5104(c) and (g)[1] relaxed the conventional presumption of

_____

[1] Section 5104(c) empowers courts to submit parties to blood testing in order to determine paternity, parentage, or identity of a child. It provides,
*(Footnote Continued Next Page)*

- 2 -

paternity, this argument cannot overcome the weight of our jurisprudence that interprets the statute in a manner that limits its application to scenarios where: (1) the family is no longer intact when paternity is challenged; (2) the husband fails to accept parental responsibility for the child; or (3) clear and convincing evidence establishes impotency, sterility, or non-access when conception occurred. *See Brinkley*, *supra* at 179. Indeed, it remains well ensconced that, "The presumption of paternity is unrebuttable when, at the time the husband's paternity is challenged, mother, her husband, and the child comprise an intact family wherein husband has assumed parental responsibilities for the child." *Vargo v. Schwatrz*, 940 A.2d 459, 463

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯⎯

> In any matter subject to this section in which paternity, parentage or identity of a child is a relevant fact, the court, upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, may or, upon motion of any party to the action made at a time so as not to delay the proceedings unduly, shall order the mother, child and alleged father to submit to blood tests. If any party refuses to submit to the tests, the court may resolve the question of paternity, parentage or identity of a child against the party or enforce its order if the rights of others and the interests of justice so require.

23 Pa.C.S. § 5104(c).

Section 5104(g) addresses the effect of scientific evidence on the presumption of paternity as follows: "The presumption of legitimacy of a child born during wedlock is overcome if the court finds that the conclusions of all the experts as disclosed by the evidence based upon the tests show that the husband is not the father of the child."

- 3 -

(Pa.Super. 2007). **See also K.E.M. v. P.C.S.**, 38 A.3d 798, 810 n.8 (Pa. 2012) (recognizing that legal fictions regarding irrelevancy of paternity testing retains "their greatest force where there is truly an intact family attempting to defend itself against third-party intervention.").

I acknowledge that we are bound by the entrenched case law regarding the broad application of the presumption of paternity, and the systematic preclusion of third-party challengers to paternity of a child in an intact family. I believe that the General Assembly or our High Court should revisit this legal fiction in light of the advancements in testing and our contemporary perspective of family and fashion a flexible approach for ordering paternity tests that affords trial courts the discretion to weigh scientific evidence of paternity in line with the express terms of § 5104(c) and (g).

Revealingly, the respective dissenting opinions that Justice Nigro and Justice Newman authored fifteen to seventeen years ago in both **Brinkley**, **supra** and **Strauser**, **supra** continue to resonate.[2] As the cruces of the

_____

[2] Justice Nigro and Justice Newman concurred with the portion of the lead opinion in **Brinkley** that found that the presumption of paternity did not apply in that case because the marriage was no longer intact, but both disagreed with the opinion's position that the presumption was unrebuttable when a third party asserts his paternity to a child born to an intact marriage. In **Strauser v. Stahr**, 726 A.2d 1052, (Pa. 1999), both justices categorically rejected the majority's mechanical application of the doctrine to form an unrebuttable presumption of husband's paternity, absence a showing of
*(Footnote Continued Next Page)*

justices' estimations in these seminal cases remain relevant, I believe they warrant further discussion.

In **Brinkley**, Justice Nigro stressed that the presumption of paternity should not be applied mechanically in every case and noted that, "In light of the changed, and increasingly fluid, nature of the family, and the increased rates of divorce and separation, these legal fictions have become less reflective of social reality. They are now more problematic than useful, and more likely to lead to unfair results." **Brinkley**, **supra** at 182 (Nigro, J. concurring and dissenting). The learned Justice Nigro opined, "when the reason for a law ceases, the law should also cease . . . I believe that the time has come to take this principle to its logical conclusion in the law of paternity." **Id**. Instead of continuing to apply the presumption of paternity as a robotic bar to third-party challengers, Justice Nigro advocated an approach that permitted trial courts to utilize a range of tools, including scientific evidence, to determine paternity on a case-by-case basis. He explained the obvious benefit of this approach would be allowing the trial courts to decide whether to employ scientific evidence as conclusive or simply consider that evidence along with other factors, including the existing

---

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯

physical impossibility, when the family remained intact. Then-Justice and now former Chief Justice Castille joined Justice Newman in both cases.

family dynamic, to reach an equitable result. *Id*. at 182, 183. He continued,

> Given the realities of marriage, separation, and divorce today, I believe a flexible, case-by-case approach to paternity issues, acknowledging and benefitting from the relative certainty of blood testing, is simply more preferable than a system characterized by the strict application of overarching and outdated legal fictions that can lead, as the Majority admits, to unfair results.

*Id*. at 183. In sum, Justice Nigro opined, "it is my belief that the clarity and finality provided by a case-by-case approach involving blood testing . . . make such an approach more desirable than the current system." *Id*. at 184.

Subsequently, in his dissenting opinion in *Strauser*, *supra*, Justice Nigro reiterated his preference for a flexible methodology to paternity testing. He observed, "Such an approach permits a court to weigh the relevant evidence and circumstances of each particular situation, including blood test results, concerns as to the maintenance of an existing family unit and the interests of the child, in order to reach an equitable result." *Id*. at 1057 (Nigro, J. dissenting).

Justice Newman shared Justice Nigro's distaste for the mechanical application of the presumption of paternity. Her dissenting opinion in *Brinkley* observed that, even then, the majority of jurisdictions (approximately two thirds) permitted trial courts to use blood tests to rebut the presumption of paternity. *See Brinkley*, *supra* at 187 (Newman, J.

concurring and dissenting). She also expressed her position that a party in a paternity case should be free to employ scientific evidence pursuant to § 5104, regardless of the status of the family unit. *Id*. at 186 n.3.

Justice Newman recognized that the presumption of paternity arose, in part, to prevent children born to an intact family from receiving the legal designation of bastard. Bastard children were subject to the unfair legal ramifications of illegitimacy, such as the inability to inherit from the birth father or sue for child support. They were also forced to endure the concomitant social stigma associated with the designation generally. Accordingly, the application of the presumption of paternity was a form of protection from the unfair classification. *Id*. at 182 n.3. She reasoned that since contemporary laws abolished the undignified designation and its significant legal ramifications, the protections previously afforded by the doctrine in that regard are unnecessary. *Id*.

Thereafter, Justice Newman stressed that the only remaining purpose of the doctrine, protecting the sanctity of marriage, was outmoded. She opined,

> The goal of protecting marital integrity is also futile in a society where legal marital status does not always translate into a loving, intimate, monogamous relationship. The presumption that a child born to a married woman is a child of the marriage is dubious at best and in many cases, such as here, is absurd. We are living a fable, both morally and legally, if we think that a family is typified by "Father Knows Best," where parents and children love and respect each other and where husband and wife are faithful to each other and adultery is merely a figment

of one's imagination. Thus, the presumption that a child born during coverture is a child of the marriage has lost its place in modern society, especially considering the scientific testing available both to prove and to disprove paternity.

*Id*. (footnotes omitted).

Justice Newman also stressed that a child would benefit from confirmation of his or her birth father. She identified a litany of advantages, including the discovery of potential genetic conditions, satisfaction of a possible desire to know one's birthparents, and the allocation of economic responsibility for the child. *Id*. at 186. Moreover, since denying a putative father's right to challenge the presumptive father's paternity effectively terminates his parental rights without any legal recourse, the use of scientific evidence to determine paternity preserves the fundamental right of a father to make decisions regarding the care, custody, and control of his child. *Id*. at 186, 187.

Again, in *Strauser*, Madame Justice Newman reaffirmed her disfavor of the mechanical application of the presumption of paternity and the prevailing view in this jurisdiction that the presumption cannot be rebutted with genetic testing pursuant to § 5104(c) and (g) when the family is intact. She added that the argument that public policy, *i.e*., the sanctity of the intact marriage, favors continuing the legal fiction of an unrebuttable presumption of paternity is misplaced because, by promulgating § 5104(c) and (g), the legislature addressed the issue squarely, "codified the "public

policy" of this Commonwealth and clearly and expressly provided that a court may compel interested parties to submit to blood testing, and that such blood testing can rebut the presumption of paternity." **Strauser, supra** at 1058.

Without exception, I agree with the sentiments of Justice Nigro and Justice Newman on this issue. The flaws associated with the emotionless application of the presumption of paternity are particularly evident in this case where Mother's duplicity, dishonesty, and deceit prejudiced both Appellant and the presumptive father. Mother lied to her husband about the extent of her relationship with Appellant, and then deceived Appellant regarding, *inter alia*, the state of her marriage when the child was conceived, her intention to terminate her marriage, and the child's paternity. Prior to the pregnancy, Appellant accompanied Mother to a procedure to have her IUD removed, apparently in anticipation of the resultant pregnancy, and Appellant was excited to be an expectant father. N.T., 3/26/14, at 191, 192-193. He and Mother discussed moving closer together and perhaps eventually an engagement. *Id*. Appellant attended at least one of Mother's post-fertilization obstetrician examinations and was present for the initial ultrasound and pregnancy confirmation screen. *Id*. at 192, 193. Indeed, if a factual scenario warranted a relaxed view of the presumption of paternity that permitted the consideration of scientific evidence and the child's best interest in order to reach an equitable result, it

is here.  The record bears out that both Appellant and the presumptive father maintained an intimate relationship with Mother when the child was conceived and that prior to terminating any association with Appellant, Mother held the newborn out as Appellant's child to Appellant's family.

However, rather than permitting the trial court to make a fully informed decision grounded on O.G.'s best interest, our jurisprudence required the trial court to ignore the reality of the instant situation and perfunctorily impose the presumption of paternity to preclude Appellant from asserting his parentage.  Consequently, I join my esteemed colleagues in affirming the trial court's decision to sustain Mother's preliminary objections and dismiss Appellant's custody complaint.

Nevertheless, in alignment with the positions espoused by former Justices Nigro and Newman in ***Brinkley*** and ***Strauser***, I emphasize that the time has arrived for this jurisdiction to revisit the "naive and remiss" perpetuation of this legal fiction over conclusive scientific evidence.  ***See Brinkley***, ***supra*** 188 (Newman, J. concurring and dissenting) and ***Strauser***, ***supra*** at 1058 (Newman, J., dissenting).  Thus, mindful of the advancements in paternity testing, the current flexible notion of what constitutes a family, and the accessibility, affordability and reliability of DNA tests, I believe that the arguments that the distinguished justices articulated in ***Brinkley*** and ***Strauser*** reverberate even greater today.  Accordingly, while I join the majority memorandum, I favor an approach that affords trial

courts the discretion to consider the conclusive results of paternity testing pursuant to § 5104(c) and (g), notwithstanding the existence of an intact marriage between the birth mother and the presumptive father.