J-A05039-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| A.B.O. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| L.K.S. | : | |
| | : | |
| Appellant | : | No. 1417 WDA 2018 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| K.S. | : | |
| | : | |
| Appellant | : | |

Appeal from the Order Entered September 12, 2018
In the Court of Common Pleas of Clearfield County Civil Division at
No(s):  2018-231 C.D.


BEFORE:  GANTMAN, P.J.E., SHOGAN, J., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    FILED MARCH 19, 2019

L.K.S. (Mother) and K.S. (Husband) appeal from the trial court's order granting the request of A.B.O. (Father) to establish paternity, and ordering that C.R.S. (Child), born in November 2017, be made available for genetic testing.  After careful review, we affirm.

Mother and Father began their relationship in December 2016.  See N.T., 8/1/18, at 5.  Shortly thereafter, Mother moved in with Father.  Id. at 5-6.  In February or March 2017, Mother discovered that she was pregnant.  Id. at 6.  Mother ended the relationship with Father in April 2017.  Id. at 7.

Mother and Father discussed raising the child together, but in separate homes, primarily by text messages. Id. at 31-33. In May 2017, they discussed Child's health insurance. Id. at 8-9. Father texted Mother that, prior to adding Child to his insurance, he wanted a DNA test. Id. at 9. Mother responded angrily that Child was Father's child. Id.

In June 2017, Mother asked Father's permission, again by text message, to move out of state to North Carolina. Id. at 10. Father responded he did not have an objection to Mother moving, so long as she did not deny Father visitation with Child. Id. at 11. Mother responded that she would let Father see Child when he came to visit, and there was no "denying him." Id. Mother sent Father a "visitation agreement," which he allegedly signed,[1] stating that he allowed Mother to move out of state and establishing visitation if Mother returned to Pennsylvania, and during summers. Id. at 14-15. The agreement also specified that Mother would not deny Father the right to paternity. Id. at 15.

After Mother left Father, in May 2017, she began living with Husband in North Carolina. Id. at 65-66. From North Carolina, Mother texted Father that she had become involved with Husband. Id. In July 2017, she asked Father by text message to relinquish his rights to Child because she and Husband were planning to get married, and she wanted Husband to adopt Child. Id. at 16. Mother promised that if Father agreed, he would still be able to see

_____

[1] A signed copy of this document was never entered into evidence.

- 2 -

Child. Id. However, Mother also stated she was not planning to put Father's name on Child's birth certificate, and that Father would not know Child because Husband would raise him. Id. at 16-17. Mother continued to text message Father throughout the month of July, asking him to sign over his rights to Child; each time, Father refused. Id. at 18. Mother responded that either way, Father would have no rights and nothing to do with Child, and if she got married, the courts would have to "do a presumption of paternity." Id. at 19, 21.

Mother married Husband on September 26, 2017; Child was born in November 2017. Id. at 20, 37, 69. Father was not present at the birth because Mother would not allow him to be there. Id. Husband was listed as Child's father on the birth certificate. Id. at 21, 66-67. In December 2017, Mother texted Father that she had "gotten the paperwork done," and that Husband was Child's "father in every way." Id. at 22. Mother claimed she had done a DNA test at Walmart, but refused to show Father the results. Id. at 22-23. Mother again attempted to talk Father out of going to court by explaining the presumption of paternity to him and the alleged unlikelihood that he would succeed. Id. at 24. Mother stated that she had retained an attorney. Id. at 23.

On February 15, 2018, Father filed a petition to establish paternity and for genetic testing. In March 2018, Mother filed preliminary objections asserting that the proper procedure for a paternity matter is a complaint, and raising claims of presumption of paternity and paternity by estoppel; in

response, Father filed a complaint. Mother filed preliminary objections to the complaint, raising the same claims and asserting that Husband must be joined as a necessary party. Father filed a motion to strike Mother's preliminary objections. The court issued an order disallowing the joinder of Husband, granting Father's motion to strike the joinder and paternity by estoppel claims, denying the remainder of the motion, and dismissing Mother's preliminary objections. On June 22, 2018, Mother filed a complaint to join Husband as an additional defendant, and an answer to the complaint to establish paternity, re-raising as a new matter defenses of presumption of paternity and paternity by estoppel. Father filed an answer to Mother's new matter.

The court held hearings on August 1, 2018, and August 23, 2018. Father, Mother, and Husband testified. The parties filed post-hearing briefs. On September 12, 2018, the court entered an opinion and order granting Father's complaint and ordering that Child be made available for genetic testing. Mother and Husband timely appealed and filed a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Mother and Husband raise the following issue:

> 1. Whether the trial court committed an error of law and abused its discretion in determining that the principle of presumption of paternity was not applicable in a case where Mother's child was born into an intact marriage that continues?

Mother's Brief at 4 (unnecessary capitalization and answer omitted).

We review the trial court's order with regard to paternity for an abuse of discretion or error of law. Vargo v. Schwartz, 940 A.2d 459, 462 (Pa.

Super. 2007); see also Barr v. Bartolo, 927 A.2d 635, 639 (Pa. Super. 2007). We have stated:

> An abuse of discretion exists if the trial court has overridden or misapplied the law, or if there is insufficient evidence to sustain the order. Moreover, resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's findings if they are supported by competent evidence. It is not enough [for reversal] that we, if sitting as a trial court, may have made a different finding.

Vargo, 940 A.2d at 462 (citation omitted). The trial court is entitled to weigh the evidence presented, assess the credibility of witnesses, and believe all, part, or none of the evidence. E.W. v. T.S., 916 A.2d 1197, 1202 (Pa. Super. 2007). This Court will not disturb the trial court's credibility findings on appeal. Id.

> With regard to a legal determination of paternity, we first consider:
>
> whether the presumption of paternity applies to a particular case. If it does, one then considers whether the presumption has been rebutted. Second, if the presumption has been rebutted or is inapplicable, one then questions whether estoppel applies. Estoppel may bar either a plaintiff from making the claim or a defendant from denying paternity. If the presumption has been rebutted or does not apply, and if the facts of the case include estoppel evidence, such evidence must be considered. If the trier of fact finds that one or both of the parties are estopped, no blood tests will be ordered.

Brinkley v. King, 701 A.2d 176, 180 (Pa. 1997).

Generally, "a child conceived or born during the marriage is presumed to be the child of the marriage; this presumption is one of the strongest presumptions of the law of Pennsylvania; and the presumption may be overcome by clear and convincing evidence . . ." Brinkley, 701 A.2d at 179

- 5 -

(emphasis added). The presumption may be rebutted by clear and convincing evidence of impotency/sterility, or lack of access to wife by presumptive father. Vargo, 940 A.2d at 463. The presumption applies only where the underlying policy of this presumption – to preserve marriages – would be advanced by its application. Brinkley, 701 A.2d at 181 (finding that the underlying policy of the preservation of marriage was not served where husband and wife were divorced at the time paternity complaint was filed); see also Fish v. Behers, 741 A.2d 721, 732 (Pa. 1999).

While our case law is clear regarding the presumption of paternity of children conceived and born during marriages, we have found no published cases concerning a child who was without question conceived prior to the marriage. See, e.g., J.L. v. A.L., --- A.3d ---, 2019 Pa. Super. 60 (Pa. Super. 2019) (presumption of paternity unrebuttable where child conceived and born during intact marriage); E.W. v. T.S., 916 A.2d 1197 (Pa. Super. 2007) (presumption of paternity properly applied and unrebuttable where child conceived and born during intact marriage).

Additionally, while the presumption of paternity is unrebuttable when, at the time the husband's paternity is challenged, there is an intact family, Father in this case challenged paternity as soon as Mother claimed that Husband was Child's father. See, e.g., Vargo, 940 A.2d at 463 (noting that presumption of paternity applies and is unrebuttable when at the time paternity is challenged, there is an intact family where the husband has

assumed parental responsibilities for Child). Where the application of this presumption does not protect the marriage from the effects of disputed paternity, it is inapplicable. See T.L.F. v. D.W.T., 796 A.2d 358, 362 (Pa. Super. 2002) (presumption of paternity is inapplicable where there was no dispute as to the identity of biological father, husband never believed he was child's biological father, parties have acknowledged the extramarital affair, public separation of spouses, and mother holding paramour out as father); see also B.S. v. T.M., 782 A.2d 1031, 1036-37 (Pa. Super. 2001) (presumption of paternity is inapplicable where mother and husband reconciled and sought to apply presumption to defeat father's paternity claim).

> Paternity by estoppel is:
>
> merely the legal determination that because of a person's conduct (e.g., holding out the child as his own, or supporting the child) that person, regardless of his true biological status, will not be permitted to deny parentage, nor will the child's mother who has participated in this conduct be permitted to sue a third party for support, claiming that the third party is the true father. As [this Court] has observed, the doctrine of estoppel in paternity actions is aimed at "achieving fairness as between the parents by holding them, both mother and father, to their prior conduct regarding the paternity of the child."

Doran v. Doran, 820 A.2d 1279, 1283 (Pa. Super. 2003) (internal citation omitted).[2]

_____

[2] Although Mother and Husband originally argued paternity by estoppel before the trial court, they have abandoned this argument on appeal. Accordingly, they have waived any argument related to paternity by estoppel. See Umbelina v. Adams, 34 A.3d 151, 161 (Pa. Super. 2011) (noting that where

Mother and Husband argue that the trial court erred in determining that the presumption of paternity did not apply to Mother because her claim was "devious" and fell "well outside of the underlying policy reasons behind [the presumption's] creation." See Mother's Brief at 13. Mother argues that she had always been in a relationship with Husband, married him and had Child with him, and that Child was born into an intact marriage. Id. at 13-14.

In addition to the facts recited above, the parties testified to other facts relevant to our analysis. Father testified that he was unaware that Mother was in a romantic relationship with Husband at any time during their relationship. See N.T., 8/1/18, 15, 27. Father was aware that Mother had previously been involved in a relationship, but believed it had ended. Id. at 15-33. While Mother lived with Father, they engaged in consensual intercourse three to four times per week, and did not utilize birth control. Id. at 34; see N.T., 8/23/18, at 19-20. Father never doubted that Child was his biological child. See N.T., 8/1/18, at 6. Father testified that the first time Mother stated Child was not his was by text message in December 2017, after her marriage and Child's birth, when she informed Father that she had taken a DNA test. Id. at 22-23. However, to date, Mother has refused to produce

_____

an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived); see also Commonwealth v. Kane, 10 A.3d 327, 331 (Pa. Super. 2010) ("This Court will not act as counsel and will not develop arguments on behalf of an appellant.")

the results of the alleged test. Id. Additionally, Father denied "plying" Mother with alcohol, threatening Mother, or pointing a gun at Mother. Id. at 31-33. Father did admit that Mother drank alcohol at his house. Id.

Mother testified that her relationship with Husband started in 2014 and that they had been inseparable ever since. Id. at 55. Mother and Husband lived on Husband's mother's farm in late 2015, while both Mother and Husband were in high school. Id. Mother claimed that she and Husband became engaged to be married in December 2016 and began planning a wedding. Id. at 55-58. Mother introduced into evidence a receipt for a wedding dress dated March 2016, and a June 2016 deposit for a wedding venue; she averred that she and Husband originally planned to be married in August 2017. Id. at 56-58. However, the wedding was called off in December 2016. Id. at 58.

Mother testified that she met Father and became romantically involved with him in December 2016. Id. at 60. Mother described "staying with [Father] a few times" but also admitted to living with him. Id. at 60. Mother claimed that she was romantically involved with Husband during her entire relationship with Father, and that she would stop at Husband's house to have sexual intercourse with Husband three to four times a week, and that they did not utilize birth control. Id. at 37-38, 52, 58-62.

Mother testified that she often fought with Father, and that he would "get [her] drunk" a lot, to the point where she did not recall having intercourse with him. Id. at 38. Mother testified that although Father did not know she

was romantically involved with Husband, Father was aware that she texted Husband. Id. at 62-63. Mother stated she did not tell Father about Husband until after she moved out because she was afraid of him. Id. at 63. Mother claimed that Father "drank a lot," was verbally abusive, and kicked in his own front door. Id. at 63. Mother also testified that Father pulled a gun on her. Id.

Mother testified that she only acknowledged Father as Child's biological father because she was scared of him; also, she did not want everyone thinking that she was a "whore" for sleeping around with Husband, because she had actually been with him since 2014. Id. at 39. Mother claimed that she asked Father to sign over his rights because she had already told him he was the father and thought she "needed to ask him." Id. at 49. Mother admitted she sent the text messages to Father introduced at trial. Id. at 50-51. Mother also admitted to exchanging Facebook messages with T.O. (Paternal Grandmother) after she discovered she was pregnant, acknowledging her as Child's grandmother, showing Paternal Grandmother photographs of her stomach and sonogram pictures of Child, and discussing a potential baby shower. Id. at 41-45.

Mother admitted she never contacted an attorney, and that she lied about doing so because she wanted Father to leave her alone. Id. at 46-47. When Child was born in November 2017, Mother listed Husband as his father on the birth certificate. Id. at 66-67. Mother claimed that since Child's birth

there has not been a time Husband was not acknowledged as the father of Child. Id. at 71.

Husband testified that he is married to Mother and was previously engaged to be married to her. See N.T., 8/23/18, at 12-13. They called off the wedding due to family issues, but continued to see each other. Id. Also, they continued to engage in unprotected sexual intercourse several times a week regardless of their wedding plans. Id. at 14. Husband loves Mother and Child and considers himself Child's father. Id. at 15-16. Husband was aware that Mother was involved in a relationship with Father. Id. at 18.

At the outset, we note that the trial court, which had the benefit of hearing the evidence, viewing the witnesses, and judging their demeanor, found Mother's testimony not credible on disputed issues of fact. See, e.g., E.W., 916 A.2d at 1202. These disputed issues included Mother's simultaneous sexual relationships with Husband and Father, the frequency of her relations with each man, and Father's alleged abusiveness, of which Mother presented no further evidence. See Trial Court Opinion, 9/12/18, at 4-5. Additionally, Mother admitted on the record to several lies, including informing Father that she had taken a genetic test establishing that Husband was the father of Child, when she had not; and that she had hired a lawyer, when she had not. Id.

Further, we emphasize the timing of Child's conception, Mother's messages to Father, and Mother and Husband's marriage. Mother and

Husband called off their wedding and separated in December 2016. Mother
and Father began their relationship in December 2016. It appears that Mother
almost immediately moved in with Father. Mother discovered she was
pregnant in February or March 2017. Mother held Father out as the father of
Child, planned a baby shower, and discussed the baby with Father's relatives.
Mother ended her relationship with Father in April 2017, and almost
immediately resumed a relationship with Husband. Thereafter, Mother
repeatedly text messaged Father, demanding that he give up his parental
rights, threatening him with court action, and stating that she had researched
the concept of presumption of paternity, which would preclude Father from
exercising parental rights. Mother and Husband did not marry until late
September 2017, approximately one month prior to Child's birth.

Consistent with the foregoing, the trial court observed:

Ultimately, the duty of this [c]ourt involves more than simply
noting whether [Mother] and [Husband] were married at the time
of the child's birth, and whether that marriage remains intact.
Instead, judicial precedent clearly shows that this [c]ourt must
first determine whether applying the presumption to the specific
facts of the case at hand, following an evaluation of all facts
presented at the hearing and a determination of the credibility of
the witnesses, would promote the original purpose of the
presumption.

Several facts are exceptional about this case, setting it apart from
most other presumption cases filed within this [C]ommonwealth.
First, it is clear that [Mother] was in an active relationship with
[Father] during the time of conception. [Mother] makes several
assertions in an attempt to negate this fact, including that she
cannot remember having sexual relations with [Father]
specifically during the time of conception, and that she was also
in a sexual relationship with [Husband] at the time. However, as

noted, this [c]ourt finds that [Mother's] testimony lacks credibility and is contradictory to the additional evidence set forth by both parties at the hearing. Next, [Mother] continuously set forth [Father] as the father of the [c]hild, even after publicly resuming a relationship with [Husband]. This included planning baby showers, communicating regularly with [paternal grandmother] about the child, and repeatedly insisting that she would not prevent [Father] from exercising his parental rights after she began her relationship with [Husband]. It wasn't until after [Mother] and [Husband] were married that [Mother] first indicated that [Father] may not be the father of the [c]hild. Lastly, and perhaps most damning to [Mother], the evidence presented by [Father] at the hearing shows that [Mother] acknowledged to [Father] that she intended to marry [Husband] so that the presumption would apply, all while asserting that [Father] was the father and asking him to "sign over his rights." This [c]ourt sees this as nothing more than a manipulation of the law in an attempt to convince [Father] to willingly give up any legal rights to his biological child.

Thus, this [c]ourt has determined that, as in B.S. v. T.M., [782 A.2d at 1036-37,] the presumption of paternity should not be applied to the case at hand because there is no, or very minimal, harm that will befall the marriage of [Mother] and [Husband], as they were not married, or even technically in a relationship, at the time the child was conceived and for most of [Mother's] pregnancy, and [Husband] was fully aware that [Mother] set out [Father] as the father of the child until the time it was no longer convenient to do so. Or, to put it more concisely, [Husband] was the "other man" in [Mother's] relationship with [Father]. Last, and most significant to the [c]ourt, [Mother] made it very clear to [Father] that she intended to use the presumption of paternity as a means of preventing him from exercising any parental rights to the child she had continuously claimed belonged to him. It is the opinion of this [c]ourt that the use of the presumption of paternity in this manner is devious and falls well outside of the underlying policy reasons behind its creation.

Trial Court Opinion, 9/12/18, at 12-13.[3]

Upon review, we conclude that the record supports the trial court's findings. See, e.g., Vargo, 940 A.2d at 462; E.W., 916 A.2d at 1202; B.S., 782 A.2d at 1036-37. The presumption of paternity is untenable where Husband was aware of Mother's relationship with Father and Father's paternity claims, and Mother and Husband's marriage was entered into to deprive Father of his parental rights. Accordingly, we discern no error or abuse of discretion by the trial court in granting Father's request and ordering that Child be made available for genetic testing.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/19/2019

_____

[3] The trial court concluded, for similar reasons, that the doctrine of paternity by estoppel was not applicable because the doctrine was designed to prevent a party who previously asserted parental rights to a child from asserting otherwise to the detriment of the party relying on the assertion. Id. at 14. In this case, where Mother requested that the court apply the doctrine to preclude Father from asserting paternity, the doctrine was not applicable. Id. As noted above, Mother has abandoned this claim on appeal.